[No. S093456. Feb. 3, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEX DALE THOMAS, Defendant and Appellant.

[Page content redacted]

452

454

COUNSEL

Robert Derham, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Alice B. Lustre and Sharon E. Loughner, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MORENO, J.**—Defendant Alex Dale Thomas, a substitute janitor at Rio Linda High School, raped and murdered 18-year-old student Michelle Montoya. Defense counsel did not contest that defendant killed the victim, but denied that he raped her, suggesting defendant had engaged in consensual sex with the victim, then killed her in a panic because he believed he had committed statutory rape and, as a convicted felon, could be sent to prison for life under the "Three Strikes" law. Defendant was convicted of murder with the special circumstance that the murder was committed during the commission of rape, and was sentenced to death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)[1] For the reasons that follow, we affirm the judgment.

## I. FACTS

An information filed on November 21, 1997, in Sacramento County Superior Court charged defendant with murdering Michelle Montoya on May 16, 1997 (§ 187, subd. (a)), with the special circumstance that the murder was committed during commission of the crime of rape (§ 190.2, subd. (a)(17)(C)), and with raping the victim (§ 261). The information further alleged that defendant personally used a deadly or dangerous weapon in committing the murder (§ 12022, subd. (b)) and that both the murder and the rape were serious felonies (§ 1192.7, subd. (c)). The information alleged that defendant had suffered eight prior convictions, including convictions for the serious felonies of voluntary manslaughter, robbery, and exploding a destructive device with intent to injure.

The trial court denied defendant's motion for a change of venue and the Court of Appeal summarily denied defendant's petition for writ of mandate. We stayed the trial and granted review on August 18, 1999, and transferred the matter to the Court of Appeal with directions to issue an alternative writ

---

[1] All further undesignated statutory references are to the Penal Code.

of mandate. On March 17, 2000, counsel stipulated to a change of venue to Sonoma County. On July 5, 2000, jury trial commenced in Sonoma County Superior Court.

### A. *Guilt Phase*

#### 1. *Prosecution's Case*

The victim, Michelle Montoya, was a senior at Rio Linda High School who had just turned 18 years old. On Friday, May 16, 1997, she stayed after school to meet with her English teacher about a research paper she was writing. She mentioned that she needed to make a telephone call to arrange for a ride home, but declined her teacher's offer to use her cell phone. The victim left the meeting about 3:30 p.m.

The victim telephoned her stepfather, Joseph Schleeter, sometime between 3:30 and 3:45 p.m. to ask for a ride home. Schleeter told her that it would be 10 or 15 minutes before he could come; she replied she would find her own ride home and hung up. Schleeter later drove to the victim's school and waited for her, but left when she did not appear.

A few minutes before 3:00 p.m., Robert Erickson had locked the doors to his shop classroom, room L-1. In Erickson's office adjoining the shop classroom, there was a telephone that he sometimes let students use to arrange rides.

Defendant was working as a substitute janitor that day and was assigned to clean shop classroom L-1. About 4:00 p.m., janitor Robert Simpkins was walking with fellow janitor Faruq Shirley when they heard a loud sound, like a door slam. They went to investigate and saw defendant leaving a bathroom near the shop classroom. Simpkins noticed that defendant no longer was wearing the shirt that he had worn over his tank top at the beginning of the shift.

Simpkins left to resume cleaning, and defendant called Shirley over and asked him for a cigarette. Shirley said he did not smoke and began to leave, but defendant asked Shirley to accompany him to the ROTC classroom and show him how it should be cleaned. Shirley was surprised by the request, because defendant had cleaned the ROTC room the previous day, but he briefly went to the room with defendant and described what should be done. Shirley then left, but a short time later, defendant yelled and ran to him, saying there was something he had to see. Defendant ran to shop classroom L-1 with Shirley following. They entered the room and Shirley saw the victim lying on the floor. Shirley ran out of the room to find Simpkins, with defendant following him.

Shirley and defendant ran up to Simpkins and told him they had found someone who had been hurt in the shop classroom. Simpkins used his walkie-talkie to contact the office and have someone call 911. Simpkins entered the shop and found the victim lying facedown.

Officer Ruben del Hoyo of the Grant School District Police Department arrived about 10 minutes later. He entered the shop classroom and saw the victim lying on the floor with a puddle of blood around her head. She was fully clothed and wearing a backpack. He determined that she did not appear to be breathing, and left the room just as other emergency personnel were arriving. Officer del Hoyo spoke to defendant, who appeared "very nervous" and was "sweating excessively from his forehead." Defendant said he had found the victim and turned her over, then ran to get help when he saw that she was dead.

Paramedics arrived at 4:12 p.m. The victim was not breathing and had no pulse. She was lying facedown on her backpack, which was twisted around in front of her. She had large wounds on her forehead and the back of her head, and her throat had been cut. The victim was pronounced dead in the ambulance while being transported to the hospital.

Deputy Sheriff Michael Abbott and his partner Deputy Sheriff Ken Harbuck arrived at the crime scene at 4:15 p.m. Deputy Abbott approached defendant and told him he wanted to talk to him about the incident. Defendant replied: "I'm convicted and I won't go to court about this." Defendant said that he had entered the shop classroom to empty the trash can and discovered the victim's body. He touched her shoulder and then wiped his hand on his shirt, which was in his back pocket. When the victim did not move, he ran to get help. Defendant pointed out some blood on his pants, which he said had gotten on him when he slipped while running out of the classroom. Deputy Abbott asked defendant whether there were any weapons in the classroom. Defendant laughed and said, "The whole room is full of weapons." Another deputy collected defendant's shoes, as well as his shirt from his back pocket. Defendant had a scratch on his hand.

Criminalist Faye Springer examined the crime scene and found a used tampon in a paper cup with resin in the bottom, sitting on top of a work counter. No semen was found on this tampon. A crowbar found at the scene had been wiped down but still had blood on it. A trail of defendant's bloody shoe prints led from the victim's body to the tool cabinet where the crowbar was found. A tiny paint chip recovered from a bloodspot on defendant's clothing matched a sample of paint from the crowbar.

An autopsy revealed that the cause of the victim's death was blunt force trauma to the head, consistent with a blow from a crowbar. "Basically the skull was just shattered." There was a vertical laceration above the left eyebrow that extended down to bone and was "associated with an underlying fracture of the skull." A second horizontal laceration on the left temple extended down to bone. The largest laceration "extended from the mid-occipital region of the head to involve the ear" and was "associated with a fracture and through that fracture the brain was actually visible." In addition to a black eye and wounds to her hands, arms, legs, and feet, the victim had two cuts on her neck and had been stabbed in the back three times.

There were no signs of sexual trauma. The victim was wearing a tampon and a Maxi pad. The Maxi pad was blood soaked, but not the tampon. DNA analysis of semen found on this tampon matched defendant. A DNA analysis of blood taken from the crowbar matched the victim, and fragments of the victim's tissue were recovered from defendant's pants.

An expert in analyzing bloodstain patterns testified that the pant legs below the knee of the jeans defendant had been wearing on the day of the murder revealed both "high velocity blood splatter," which indicated defendant had been within a foot or two of the victim when she suffered a blow of force greater than a normal blow from a fist, as well as "medium velocity splatter," which was "consistent with a bludgeoning or beating." The expert also examined the undershorts defendant had been wearing and found "transfer type" bloodstains that were consistent with blood being deposited on the shorts from a source such as bloody fingers. Fibers recovered from the inside of defendant's undershorts were consistent with fibers from the victim's underpants, her skirt, and her Maxi pad.

### 2. Defense Case

In his opening statement, defense counsel conceded that defendant had engaged in sex with the victim, but claimed it had been consensual and suggested defendant then killed the victim because he feared that he had committed statutory rape and, if convicted, would receive a life sentence under the Three Strikes law.

Sherry Arndt, a registered nurse who specialized in examining victims of sexual assault, testified that the victim displayed "no visible injuries that are consistent with forced sexual contact."

A woodshop teacher who had been present at the high school until about 3:45 p.m. on the day of the murder testified he did not hear anyone yell or scream.

Brent Turvey, an expert in crime scene reconstruction, testified that the police conducted an inadequate investigation. His review of the evidence suggested the victim had consented to sexual intercourse and defendant had then killed the victim in an unplanned burst of anger.

### B. *Penalty Phase*

### 1. *Prosecution Case*

Kelly Minix testified for the prosecution that in 1997 she had worked at a truckstop at which defendant was employed. One day, after Minix had finished her job, defendant followed her to her automobile and, while she was seated in the driver's seat, leaned into the vehicle and sucked on her neck, leaving a bruise. She cursed, and defendant backed out of the automobile, apologized, and left.

Defendant's former wife, Delores Thomas, testified that in August 1994, defendant had punched her in the face during an argument.

Former Los Angeles County Deputy Sheriffs Lee Woods and Richard Calzada testified that in 1985 defendant had slashed the throat of fellow prisoner Vincent McCowan while both men were incarcerated in the Los Angeles County jail. Sergeant Gerald Franks testified that in 1986 he was working as a correctional counselor in the reception center of the California Institution for Men in Chino, and interviewed McCowan. Sergeant Franks asked McCowan if he had any enemies in the prison system. McCowan named defendant and explained that defendant had slashed his throat when they both were incarcerated in county jail. Sergeant Franks later interviewed defendant, who "reluctantly verified" that he had assaulted McCowan.

Estella Black testified that in 1984, defendant had robbed her, her daughter, and her son-in-law at gunpoint in front of her apartment in Los Angeles.

In 1978, defendant shot 12-year-old Samantha Mims as she lay in her bed next to her younger brother. She survived, but suffered severe injuries, including the loss of one kidney and part of her small intestine. Mims does not know why defendant shot her.

When defendant was 17 years old, he pled guilty to possession of an inflammatory device, or Molotov cocktail, and was sent to the California Youth Authority (now Division of Juvenile Justice). Later, defendant pled guilty to an attempted robbery of James Moore and robbery of Seifeddin Khalatbary.

Defendant also had been convicted of the voluntary manslaughter of Daniel White. A portion of the preliminary hearing testimony was read to the jury, reflecting that defendant approached the victim when he was in the driver's seat of his truck, pointed a gun at him, and demanded that the victim give him his "rock" (which was a term for cocaine) or $25. When the victim attempted to drive away, "a shot went off" and the victim was shot and killed.

Michelle Montoya's mother, Pam Schleeter, testified that the victim, whom she described as her "best friend," was survived by a younger sister and brother. The victim had been a soccer player who had many friends, and had been a good and helpful daughter who performed acts of kindness for neighbors and her teachers. Schleeter described the devastating impact her daughter's death had on her and her family. She had wanted to die when her daughter was killed and she still was taking antidepressants.

Darcie Purcell testified she had been the victim's friend and described how loving and close the victim's family had been. The victim was friendly, outgoing, and hard working. In addition to attending school, she had held two jobs to help support her family.

## 2. Defense Case

Patrick Ridgle testified that he had been defendant's friend since they were children. Defendant often stayed with Ridgle's family because defendant's mother drank and was verbally abusive.

Nita Sims, Ridgle's younger sister, testified she also had known defendant since they were children and had unsuccessfully attempted to teach defendant to read. Their relationship later became romantic and she gave birth to his daughter, Antoinette. Sims testified that defendant's mother was an alcoholic who smoked crack cocaine and that her six-month-old daughter had suffered burns on her thigh while in the care of defendant's mother.

Defendant's daughter, Antoinette Thomas, testified that she saw defendant periodically as a child but no longer had contact with him. Defendant's mother had burned her with a cigarette when she was a child and later tried to beat her.

Defendant's cousin, Lawana Choyce, recounted the history of defendant's family.

Clinical neuropsychologist Nell Riley testified that he conducted an extensive examination of defendant. Defendant was illiterate and his IQ varied

between 58, when he was tested at age 15, and 68, when Riley tested him. These IQ scores placed him between the first and second percentile of the general population.

Dr. Joseph Wu, a psychiatrist, interpreted a report of a PET scan (positron-emission tomography) conducted on defendant's brain in September 2000 that revealed an abnormal pattern of brain activity called "hypo-frontality which means low frontal lobe metabolism relative to the rest of the brain." The abnormality in defendant's frontal lobe functioning is similar to abnormalities found in a test group of subjects who had committed homicide. Dr. Wu testified that someone with that type of brain function abnormality "would have an impaired ability, likely, to regulate their aggressive impulses."

Alice Spivey testified that she is a mother whose eldest son is a few years younger than defendant. She saw defendant on television after his arrest, became concerned that he might need a friend, and began to visit him in jail. He treated her like a gentleman and helped her by listening to her problems. She loves defendant as if he were her son and he calls her "mom."

Dr. Gretchen White, a forensic clinical psychologist, prepared a "psychosocial history" of defendant. Defendant's great-great-grandmother was born into slavery. His mother and father were Ida Mae and Roy Lee Thomas, and he had four brothers. Defendant's mother drank heavily and consorted with other men. When defendant was young, she left her husband and moved with her sons to South Central Los Angeles, and collected welfare. Defendant had no contact with his father from the time he was seven or eight years old until he was 30 years old. Dr. White received information that defendant's home was "poorly kept," that his mother often was intoxicated, that she would yell at her children, throw things at them, put them out of the house, and call the police on them. Defendant's mother demanded money from her children, knowing their only source of income was theft. Dr. White formed the opinion that defendant's family "was extremely dysfunctional," stating: "So basically you have an individual who is damaged and impaired; who is living in a family that is not able to provide even a modicum of structure and nurturance within an environment which itself is very depleted and destructive." Defendant's mother was deceased at the time of trial.

Defendant joined the Hoover Street Crips gang when he was 12 years old. He began committing crimes and was declared a ward of the court when he was 14 years old. He spent his 18th birthday in a California Youth Authority facility, turned 21 years old in county jail, then spent the next 10 years in prison.

A videotape was played of a conditional examination of Ruthie Mae Mack. She met defendant when he was 13 years old and became friends with her son, Patrick. She is also the mother of Nita Sims, with whom defendant had his daughter, Antoinette Thomas. Defendant lived with her family for a time. Defendant could not read or tell time, yet Mack described defendant as "a very smart young man."

## II. Discussion

### A. Jury Selection Issues

#### 1. Exclusion of Prospective Jurors Who Disfavor the Death Penalty

Defendant contends the trial court erred in removing for cause four prospective jurors who expressed reservations about the death penalty, thereby violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution.

■ A prospective juror in a capital case may be removed for cause if his or her views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) Because prospective jurors "may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings" (*id.* at p. 425), "deference must be paid to the trial judge who sees and hears the juror" and must determine whether the "prospective juror would be unable to faithfully and impartially apply the law" (*id.* at p. 426). We have adopted this standard for determining whether excusing for cause a prospective juror in a capital case based on the prospective juror's views on capital punishment violates the defendant's right to an impartial jury under article I, section 16 of the California Constitution. (*People v. Griffin* (2004) 33 Cal.4th 536, 558 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *People v. Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].)

"On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous. [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 727 [60 Cal.Rptr.2d 1, 928 P.2d 485].) "In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of

being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts. [Citations.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1094 [31 Cal.Rptr.2d 321, 875 P.2d 36].)

We will examine the removal of each prospective juror in turn.

### i. *Prospective Juror No. 6-353*

Prospective Juror No. 6-353's juror questionnaire revealed that she gives music lessons in her home and is an ordained minister who holds a master's degree in theology. She checked the responses indicating that she was "Moderately against" the death penalty and "Strongly in favor" of "the penalty of life without the possibility of parole in cases of special circumstance murder." In answer to the question whether she would "**always** vote for <u>life in prison without parole</u> regardless of the facts and circumstances," the prospective juror did not select either "Yes" or "No" and instead wrote in: "I don't truthfully know."

During voir dire, Prospective Juror No. 6-353 stated she "lean[ed] very strongly towards wishing there were not a death penalty," but added that she "also believe[d] that you have to work with the system and the laws of the land as they stand." When asked by the court whether she would be "able to impose the death penalty in any case," she replied: "I don't know the answer to that." The court again asked whether she would be able to impose the death penalty if she concluded it was the appropriate penalty and the prospective juror answered: "I know for me I would have to go pretty close to the end of . . . my belief system to be able to make that statement . . . . I don't believe it's out of the realm of possibility to decide that was the proper penalty, but I think it's unlikely I would get there." Prospective Juror No. 6-353 agreed with the judge's assessment that her voting for the death penalty was a "theoretical possibility," but when the court asked if it was a "realistic possibility," she hesitated, saying "it's hard for me to answer that." The court reminded the juror that she had used the term "unlikely," and asked whether she could use the term "realistically rather than unlikely," to which the prospective juror responded: "Probably not realistically. I think probably for me to decide that the death penalty was appropriate, I would have to feel that the person was so wounded and had made such bad choices that . . . a real sense of humanity almost didn't exist there anymore, and that . . . he or she even within the prison system would be a real threat to other people."

Defense counsel asked no questions and the prosecutor asked only whether Prospective Juror No. 6-353's views were influenced by the circumstance that

her sister worked in the prison system, which the prospective juror assured him was not the case. Outside the presence of the prospective juror, the court rejected defense counsel's argument that the prospective juror could "consider both sides" and excused Prospective Juror 6-353 for cause, noting that "she said there was not probably a reasonable possibility as a matter of fact" that she could vote for the death penalty and concluding that "[h]er total philosophy and her body language told me she's substantially impaired and prevents her from following the law . . . ."

Substantial evidence supports the trial court's finding that Prospective Juror No. 6-353's views on capital punishment would substantially impair her ability to perform the duties of a juror. In her questionnaire, Prospective Juror No. 6-353 stated she did not know whether she always would vote for a sentence of life without the possibility of parole regardless of the evidence. During voir dire, the prospective juror stated she did not know whether she would be "able to impose the death penalty in any case" and explained that while it was theoretically possible that she could vote for the death penalty, it was "[p]robably not realistic[]." In *People v. Griffin, supra,* 33 Cal.4th 536, 559, we held that the trial court properly excused for cause a prospective juror who stated on voir dire "that she did not know whether she *ever* could vote to impose the death penalty, regardless of the state of the evidence" and another prospective juror who stated she generally supported the death penalty but added that "she did not know whether she actually could vote to impose the death penalty . . ." (*id.* at p. 560).

### ii. *Prospective Juror No. 6-483*

In her questionnaire, Prospective Juror No. 6-483 selected the responses indicating that she was "Strongly against" the death penalty and "Strongly in favor" of the penalty of life in prison without the possibility of parole in cases of special circumstance murder. She explained that she felt that way because "I feel there have been many innocent people sent to the gas chair." She indicated that she would *not* be able to exclude from her consideration of the proper penalty the argument that the death penalty is more expensive to the taxpayer than life without the possibility of parole and indicated that she would always vote for life in prison without parole, regardless of the facts and circumstances of the case. She added: "I would not like to go through life knowing I was responsible for someone's life."

On voir dire, Prospective Juror No. 6-483 confirmed that she always would vote for life in prison rather than the death penalty and explained that her statement that she "would not like to go through life knowing I was responsible for someone's life" referred only to the death penalty, adding, "Life in prison is fine." She stated she "probably" could vote for the death

penalty if "there was no doubt" the defendant was guilty, "but I wouldn't be happy about it," adding "[I] really don't think I would." The court explained that the penalty phase would be conducted only if the jury had found defendant guilty beyond a reasonable doubt and asked Prospective Juror No. 6-483 whether "if you found a person guilty beyond a reasonable doubt of first degree murder with special circumstances, you could vote for the death penalty?" She replied: "I think it would be life in prison."

Under questioning by defense counsel, the prospective juror repeated that she could consider voting for the death penalty only if she "thought he was really really guilty. . . . [¶] But there would have to be no doubt in my mind . . . ." Defense counsel pointed out that if the prospective juror had a doubt, she could prevent the conviction and asked whether she could vote for the death penalty if she was part of the jury that had determined guilt. Prospective Juror No. 6-483 answered: "I guess."

Under questioning by the prosecutor, Prospective Juror No. 6-483 repeated her belief that "lately there has been a lot of DNA evidence that has gotten a lot of people off of death row because they were innocent, and . . . to take someone's life and then find out that they were, you know, innocent would really be terrible." When asked if that meant that she would impose a standard more stringent than proof beyond a reasonable doubt at the guilt phase of the trial, the prospective juror answered: "I don't think so. I don't know." She stated she "probably" could vote for the death penalty "if I really felt that was necessary, he was very bad," but added she "would have to get used to the idea." When asked if the state had the right to execute someone, she answered: "Yeah, I guess. . . . [¶] But I don't know if I want to be responsible for someone's death."

Prospective Juror No. 6-483 explained that if the rest of the jury "was for" the death penalty, and she knew "he was really guilty, I might go along with it. . . . Probably would." But when asked if she "theoretically could" vote for the death penalty, she answered: "No. I probably could if I had to."

Outside the presence of the prospective juror, the prosecutor made a challenge for cause. Defense counsel submitted without argument. The court excused Prospective Juror No. 6-483 for cause, stating: "The juror is substantially impaired not merely by her words but when she would shake her head no and say 'I guess,' the whole body language as well I suppose. Clearly impaired."

Substantial evidence supports the trial court's finding that Prospective Juror No. 6-483's views on capital punishment would substantially impair her ability to perform the duties of a juror. In her questionnaire, Prospective Juror

No. 6-483 stated she was "[s]trongly against" the death penalty because "there have been many innocent people sent to the gas chair," adding that she would always vote for life in prison without parole regardless of the facts and circumstances of the case because she "would not like to go through life knowing I was responsible for someone's life."

The prospective juror confirmed these views on voir dire and equivocated only to the extent of allowing that she might vote for the death penalty if defendant was "really really guilty" and she had "no doubt," but explained that even then she "wouldn't be happy about it" and "really don't think I would." She stated that she "probably" could "go along" if the rest of the jury voted for death and defendant was "really guilty," but then added contradictorily when asked whether she "theoretically could" vote for the death penalty: "No. I probably could if I had to."

We held in *People v. Wash* (1993) 6 Cal.4th 215, 255 [24 Cal.Rptr.2d 421, 861 P.2d 1107], that the trial court in a capital case properly excused for cause a prospective juror who stated she could vote for the death penalty " 'if the evidence was overwhelming,' " but "consistently responded, 'I don't know' in answer to the question whether she was capable of voting for death if all the evidence indicated that it was the appropriate sentence." We relied upon the rule that " ' "[W]here equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his [or her] true state of mind is binding on an appellate court." ' [Citations.]" (*Ibid.*)

### iii. *Prospective Juror No. 74*

At the outset of voir dire, the court denied Prospective Juror No. 74's written request to be excused from jury service because she teaches a class for blind, deaf, and autistic students that would be cancelled if she was required to serve as a juror.

Prospective Juror No. 74 explained during voir dire that nearly 20 years earlier four friends had been prosecuted for rape; two were convicted. She felt the men were innocent and had been prosecuted only because "the district attorney was running for reelection and they trumped up this case to be something other than it was," adding that "the press had a field day."[2] She believed that no rape had occurred and that the victim had been "sent in to entrap these guys."

---

[2] In her questionnaire, Prospective Juror No. 74 had written that what is wrong with the criminal justice system is "publicity."

The prospective juror explained that she knew her friends had been treated unfairly because the press had misrepresented some events that she had witnessed, adding she "wrote lots of letters, sent lots of petitions," but was "completely ignored." She thought she could base her decision in this case solely on the evidence, but added: "I also think that what happens out in the world is important, too. And I was witness to some of these things that were reported wrongly in the paper."

Prospective Juror No. 74 also recounted an unrelated incident in which her "daughter's boyfriend was brutally beaten by police officers" but the officers had "prevailed wrongfully" because in court "the policemen, were very professional in there [sic] witnessing. And my daughter's boyfriend was, you know, the way that he prepared for trial was to buy new Levi's." She felt the police officers had engaged in "police brutality."

Despite these two incidents, Prospective Juror No. 74 did not feel any general animosity against prosecutors or police officers, explaining: "I don't believe they're all abusers, but I have been witness to these two things which were out of the ordinary." When asked if she would disbelieve law enforcement witnesses because of her experiences, she answered: "I don't know. I mean I don't think so. . . . [¶] And I think I could accept their testimony if I believed it was true."

In her questionnaire, the prospective juror had indicated the criminal justice system makes it "easy to prosecute the innocent," explaining on voir dire that she was referring to the two incidents described above. She indicated that her opinion about the death penalty had changed and wrote in the name, "Richard Alan Davis,"[3] explaining on voir dire that she always had "been on the fence" about capital punishment, but now was convinced that it was appropriate in that case and others. She doubted that a sentence of life without the possibility of parole meant the defendant would be incarcerated for his entire life, adding "many, so sentenced, get out."

During voir dire, Prospective Juror No. 74 twice answered "I don't know" when asked if she would be able to vote for a sentence of death. When asked if she could do so if she "were convinced that it was the appropriate penalty under the law and the facts" she replied: "I think so."

The prosecutor later observed that Prospective Juror No. 74 had hesitated before saying she thought she could vote for the death penalty, and the prospective juror responded that she "did hesitate" because "it's a very heavy

---

[3] Richard Allen Davis was sentenced to death for the murder of 12-year-old Polly Klaas. (*People v. Davis* (2009) 46 Cal.4th 539 [94 Cal.Rptr.3d 322, 208 P.3d 78].)

question," explaining: "I would like to believe that if I truly believed someone was guilty that . . . I could do that. But I don't know." The prosecutor asked whether Prospective Juror No. 74 was reluctant to vote for the death penalty because she "could never really live with yourself if you voted for the death penalty," and the prospective juror replied, "I don't know," adding: "I don't know how I would feel afterwards." The prosecutor then asked whether the prospective juror could be open to voting for the death penalty if the evidence supported it, to which she answered, "I think so."

Outside the presence of the prospective juror, the prosecutor challenged her for cause, stating, "there are problems with her ability to be a fair and impartial juror coming from several quarters. The facts on which she has provided us in connection with her hardship claim, her prior experience with individuals whom she believes were improperly prosecuted and in the case of them—two of them, convicted. And her very candid expression of difficulty with the concept of the death penalty itself. She can't say that she is sure that she could impose the death penalty. She can only say that she would try and she thinks she might be able to be sure but clearly even when I asked the question [in] as direct a fashion as I can, she hesitated for a long time, her words are spoken with a great deal of indecisiveness in my opinion."

The court observed, "This lady has a lot of problems. . . . [¶] Not only for the prosecution but a lot of problems for the defense, too."

Defense counsel admitted he had "questions about her" and observed that, at first, she was "very, very nervous, her lips were smacking . . . almost like she was a deer in the headlights" and "couldn't gather her thoughts," and had difficulty understanding questions. But defense counsel felt "she started relaxing a little bit" and indicated "she could vote either way." The court interrupted to point out, "What I heard, though, was that she didn't know."

The court initially denied the prosecutor's challenge, stating: "I don't think I can grant the challenge for cause on the death penalty." The court noted it had "some real reservations about whether or not she is capable or willing to follow the law and I have a strong impression she probably couldn't or wouldn't. And, yet, she did answer questions." The prosecutor agreed that her answers appeared "to pass muster," but they were not said in a way "that gives me confidence."

The next day, the court reconsidered its ruling and excused the prospective juror for cause, stating he had read the reporter's transcript of proceedings and was "convinced that she could not apply the law or follow the evidence." Relying in part on the prospective juror's "body language," the court stated

it was "convinced she could simply not be a fair, impartial juror." The court clarified that its ruling was "not just limited to the death penalty questions . . . . [¶] It's the whole thing."

Substantial evidence supports the trial court's order excusing Prospective Juror No. 74. The trial court was justified in concluding that the prospective juror's views on capital punishment alone would substantially impair her ability to perform the duties of a juror. Despite indicating on her questionnaire that she was strongly in favor of the death penalty (she also indicated she was strongly in favor of life without parole) and her statement on voir dire that the death penalty was appropriate in some cases, Prospective Juror No. 74 was never able to state that she would be able to vote for the death penalty, repeatedly answering "I don't know." The closest she came was stating that she thought she could vote for the death penalty and "would like to believe" that she could, but actually did not know.

As noted above, we held in *People v. Wash, supra*, 6 Cal.4th 215, 255, that a trial court in a capital case properly may excuse for cause a prospective juror who states she does not know whether she could vote for the death penalty. The present case presents a close call, as evidenced by the trial court's initial denial of the prosecutor's challenge for cause, but the trial court's final ruling is entitled to deference because the "trial court's finding concerning a prospective juror's state of mind 'is based upon determinations of demeanor and credibility that are peculiarly within a trial court's province.' " (*People v. Schmeck* (2005) 37 Cal.4th 240, 263 [33 Cal.Rptr.3d 397, 118 P.3d 451].)

The trial court's ruling is further supported by other indications in the record that Prospective Juror No. 74 would not be a fair and impartial juror. The prospective juror's experience with the rape prosecution decades earlier had left her with the view that the victim, the prosecutor, the defense attorney, and the press all had behaved poorly and her efforts to correct this injustice had been "completely ignored." She also believed her daughter's boyfriend had been the victim of police brutality, but that the police officers had "prevailed wrongfully" in court. When asked whether she could nonetheless be fair, she replied, "I've never been in this position before. And I feel that I could be honest in reviewing the evidence and coming to a conclusion. But I've never been—I don't know. I mean, I really don't know. I've not had to be—I've never had to do this." And when asked whether she could base her decision in the present case solely on the evidence presented in court, she again answered equivocally, saying: "I think I could do that, but I also think that what happens out in the world is important, too."

Even defense counsel, in opposing the prosecutor's motion to excuse Prospective Juror No. 74 for cause, admitted he had "questions about her" and acknowledged that the prospective juror was "very, very nervous," looked almost like "a deer in the headlights," "couldn't gather her thoughts" and "was having trouble following . . . questions." The court excused Prospective Juror No. 74 because she "could not apply the law or follow the evidence" and "could simply not be a fair, impartial juror." "In general, the qualification of jurors challenged for cause are 'matters within the wide discretion of the trial court, seldom disturbed on appeal.' [Citation.] When, as here, a juror gives conflicting testimony as to her capacity for impartiality, the determination of the trial court on substantial evidence is binding on the appellate court. [Citations.]" (*People v. Kaurish* (1990) 52 Cal.3d 648, 675 [276 Cal.Rptr. 788, 802 P.2d 278].)

### iv. *Prospective Juror No. 833*

In her questionnaire, Prospective Juror No. 833 selected the responses that she was "Strongly against" the death penalty and "Strongly in favor" of life in prison without parole for special circumstance murder. She explained her opposition to the death penalty as follows: "I am a Christian, it would be difficult for me to sentence someone to death because of my belief in the goodness of God's creation." She added: "I'm not sure I could sentence someone to death even if I did find them guilty." In answer to the question whether she always would vote for life in prison regardless of the circumstances, she wrote: "I'm really not sure—my feeling is that I would find it very difficult to vote for the death penalty."

The court asked Prospective Juror No. 833 during voir dire whether she was capable of voting for the death penalty if she decided that it was the appropriate penalty, and she answered: "I really don't know." The prospective juror, who was a registered nurse, explained that she could not put herself "in the position of being the person that executed" the defendant, later repeating that she could not administer the lethal injection herself.

The prospective juror told defense counsel she "would consider" voting for the death penalty, but when asked by the prosecutor if she actually could cast her vote for the death penalty, stated: "I don't think so." She told the court that by saying "I don't think so," she meant she could not vote for the death penalty and when asked whether there was a reasonable possibility that she could vote for the death penalty, replied: "I don't know. I don't know."

Outside the presence of the prospective juror, the court granted the prosecutor's motion to excuse for cause Prospective Juror No. 833, finding

that "she would be unable to faithfully and impartially apply the law and therefore is substantially impaired."

Substantial evidence supports the trial court's finding that Prospective Juror No. 833's views on capital punishment would substantially impair her ability to perform the duties of a juror. In her questionnaire, Prospective Juror No. 833 stated she was strongly against the death penalty and her religious beliefs would make it difficult for her to sentence someone to death. She wrote twice that she was not sure she could vote for the death penalty and once more that it would be difficult for her to vote for the death penalty. During voir dire, she repeated that she was not sure she could vote for the death penalty, indicating her reason was that she could not administer the lethal injection herself.

Although the prospective juror told defense counsel it was possible she could vote for the death penalty and promised that she could consider it, she then told the prosecutor she did not think she could actually do so, and twice told the court she did not know whether she could vote for the death penalty.

As noted above, we held in *People v. Griffin, supra*, 33 Cal.4th 536, 560, that the trial court properly excused for cause a prospective juror who stated on voir dire "she did not know whether she actually could vote to impose the death penalty . . . ." Prospective Juror No. 833 consistently explained that, while she could consider the death penalty and there was a possibility she could vote to impose it, her religious beliefs would make it very difficult for her to vote for the death penalty and she did not think she could do it. This amply supports the trial court's order excusing Prospective Juror No. 833.

### 2. *Peremptory Challenge to African-American Prospective Juror*

Defendant contends the prosecutor violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and article I, section 16 of the California Constitution by using a peremptory challenge to remove from the jury venire the sole remaining African-American.

During voir dire, Prospective Juror No. 550, who was 31 years old, stated that about 10 years earlier, he had been involved in "a fight" with a woman at a party, stating "this woman hit me and I hit her back." He complained that when he went to court, the public defender advised him "to accept a three year deal in San Quentin for·spousal abuse." The prospective juror refused and left town, but later returned to court and "did 30 days over at the farm." The prospective juror also remarked that he had had brushes with the law as a juvenile and mentioned that his father had a long criminal record.

When Prospective Juror No. 550 was 11 or 12 years old, he and his family were robbed at gunpoint by four men who entered their house wearing "bee keepers masks." They knocked over his uncle, who was in a wheelchair, then hit his grandmother on the head and stole her purse. The prospective juror ran to his room, jumped out the window, and called the police from a friend's house. When the police arrived, "[t]hey laughed in everyone's faces" while his "grandmother was sitting there crying." Prospective Juror No. 550 said that "nothing ever came of" the police investigation, but "[t]he streets found out who . . . did it. And the streets dealt with it." The prospective juror explained that he was not involved because he was 11 years old, but "[t]he people who . . . allegedly robbed my grandmother was run out of town."

Prospective Juror No. 550 had worked for his former employer for four months, and for the past four months had been working for a temporary employment agency and "build[ing] computers at home on the side." When defense counsel asked if serving as a juror would pose a financial hardship, the prospective juror answered: "Money doesn't bother me. A lot of people get caught behind money. They have to have it. It's like a disease . . . ." The prospective juror explained that he lived rent free in a van on his father's property, so being a juror would not pose a financial hardship because he was "not living in a money based world." Prospective Juror No. 550 stated that he had gone to school until "about eleventh grade. I had to go out [to] work and eat after that."

Just before counsel began to exercise their peremptory challenges, the prosecutor informed the court that he intended to exercise a peremptory challenge against Prospective Juror No. 550, who was the "one African American man who remains in the panel." Defense counsel indicated he would object and "make a Wheeler-Batson motion." Later that day, the prosecutor exercised a peremptory challenge against Prospective Juror No. 550 and he was excused. Defendant objected and moved for a mistrial. Defense counsel stated that "out of our panel of four hundred people or so," there were two African-Americans, one of whom the parties stipulated could be excused on the basis of hardship. Defense counsel argued that the prosecutor's peremptory challenge created "its own pattern" of excluding prospective jurors on the basis of race "because of the sense he is the only one."

Without determining whether defendant had made a prima facie showing of group bias, the court asked the prosecutor to explain his reasons and the prosecutor stated that he exercised a peremptory challenge against Prospective Juror No. 550 "not because he is [B]lack, but because he is irresponsible. I feel that at age thirty-one he is under-employed. He has not had significant employment in his life. He now . . . lives out of his van on his father's

property." The prosecutor noted that the prospective juror's father apparently had served time in prison. The prosecutor described as "bizarre" the prospective juror's description of the home invasion robbery by men wearing beekeeper hats, saying: "I still don't understand exactly what happened." The prosecutor believed Prospective Juror No. 550 had not "been entirely forthright or at least accurate in his description of that incident. He claims . . . he has no bias against law enforcement, but I have a doubt about that self-stated state of mind."

The prosecutor had obtained the prospective juror's criminal history and believed that the prospective juror had "understate[d] his criminal record" failing to mention he had misdemeanor convictions for resisting a police officer and petty theft as well as a probation violation. The prosecutor concluded: "In sum, I just don't feel that this young man has demonstrated the kind of personal responsibility that I would like to see in a juror sitting in a capital case."

The trial court denied defendant's motion for mistrial, stating the court had reread the reporter's transcript of the voir dire of the challenged juror and concluded "there is just lots of reasons I think besides being [B]lack that a challenge could be exercised."

■ "[T]he use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. This does not mean that the members of such a group are immune from peremptory challenges: individual members thereof may still be struck on grounds of specific bias . . . ." (*People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 [148 Cal.Rptr. 890, 583 P.2d 748].) In *Batson v. Kentucky* (1986) 476 U.S. 79, 89 [90 L.Ed.2d 69, 106 S.Ct. 1712], the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."

The decision in *Batson* set forth a three-step procedure. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted.)

Quoting our decision in *People v. Zambrano* (2007) 41 Cal.4th 1082, 1106 [63 Cal.Rptr.3d 297, 163 P.3d 4], defendant urges this court to " 'assume, without deciding, that defendant did satisfy the first, or prima facie, step of *Batson* and *Wheeler*' and proceed directly to the second and third steps of the *Wheeler/Batson* analysis." The Attorney General agrees that because the prosecutor presented his reasons for exercising the peremptory challenge, "the question of whether defense counsel established a prima facie case is immaterial." We thus proceed to determine whether the trial court erred in finding that the prosecutor's reasons for exercising his peremptory challenge against Prospective Juror No. 550 did not show purposeful racial discrimination. (*People v. Mills* (2010) 48 Cal.4th 158, 174 [106 Cal.Rptr.3d 153, 226 P.3d 276]; *People v. Lenix* (2008) 44 Cal.4th 602, 613, fn. 8 [80 Cal.Rptr.3d 98, 187 P.3d 946] ["Here, the trial court requested the prosecutor's reasons for the peremptory challenges and ruled on the ultimate question of intentional discrimination. Thus, the question of whether defendant established a prima facie case is moot."]; but see *People v. Taylor* (2010) 48 Cal.4th 574, 614 [108 Cal.Rptr.3d 87, 229 P.3d 12] ["the trial court impliedly found defendant failed to establish a prima facie case under *Wheeler/Batson*," despite the court's having asked the prosecutor to state her reasons for exercising the peremptory challenge].)

■ "A prosecutor asked to explain his conduct must provide a ' "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.] 'The justification need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.]" (*People v. Lenix, supra*, 44 Cal.4th 602, 613.) " '[W]e review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "with great restraint." ' [Citation.] The trial court's determination is a factual one, and as long as ' " 'the trial court makes a "sincere and reasoned effort" to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal' " ' when they are supported by substantial evidence. [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 117 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

Defendant argues that the trial court failed to determine whether the prosecutor's stated reasons for exercising the peremptory challenge were pretextual and instead "found in the abstract that there were 'lots of reasons . . . besides being [B]lack that a challenge *could be* exercised.' " Defendant is correct that the pertinent question is not whether, in the abstract, there were valid reasons the prosecutor might have relied upon in exercising the peremptory challenge, but whether the prosecutor actually relied upon a nondiscriminatory reason. We conclude, however, that defendant parses the

trial court's statement too closely in arguing that the trial court failed to address the proper issue. The prosecutor stated numerous nondiscriminatory reasons for exercising a peremptory challenge against Prospective Juror No. 550. The trial court carefully considered defendant's motion for a mistrial and the prosecutor's reasons, taking the time to review the reporter's transcript of the voir dire. In context, therefore, we conclude that the trial court's statement in denying defendant's motion for a mistrial that "there is just lots of reasons I think besides being [B]lack that a challenge could be exercised" was an inartful way of saying that the prosecutor, in fact, had relied upon reasons other than the prospective juror's race in exercising the peremptory challenge.

"When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings." (*People v. Silva* (2001) 25 Cal.4th 345, 386 [106 Cal.Rptr.2d 93, 21 P.3d 769].) In the present case, the prosecutor's stated reasons for exercising a peremptory challenge against Prospective Juror No. 550 are quite plausible and are amply supported by the record. While it would have been preferable for the trial court to have expressly found that the prosecutor relied upon a nondiscriminatory reason, no such express finding was required. The trial court did not err in denying the motion for a mistrial.

### B. *Guilt Phase Issues*

#### 1. Miranda

Defendant contends the trial court deprived him of his rights under the Fifth, Eighth, and Fourteenth Amendments by admitting into evidence an out-of-court statement he made at the scene of the crime while allegedly in custody and without having been advised of his rights as required by the decision in *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

Deputy Sheriff Michael Abbott testified that he and his partner arrived at Rio Linda High School at 4:15 p.m. on May 16, 1997, in response to a radio call. Several police officers and firefighters were already at the scene. Deputy Abbott went into the shop classroom and saw the victim lying in a pool of blood. He left the classroom and was told by a school district police officer that defendant had discovered the victim's body. The officer also said that blood had been discovered in a bathroom, and defendant had been seen washing his hands in that bathroom. Before Deputy Abbott went to examine the bathroom, he asked a fellow deputy to have defendant detained.

■■■■■■■■■■■■■■■■■■■■■■■■■■

Deputy Mark Bearor approached defendant and asked him to accompany him to his patrol vehicle, telling defendant that "he was a witness in this crime and that we had detectives en route and due to the severity of the crime the detectives would probably be handling the interviews of the primary witnesses and that he was going to be detained." Defendant agreed and Deputy Bearor placed defendant in the backseat in order to "detain Mr. Thomas for the detectives . . . so that they could interview him." The rear doors of the patrol vehicle could not be opened from the inside. The deputy turned up the air conditioning and closed the doors. He did not search or handcuff defendant.

After defendant had been in the backseat of the patrol car for about 20 minutes, Deputy Abbott returned, let defendant out of the patrol car, asked him to come to the rear of the vehicle, and asked defendant to tell him "what had happened that day." Defendant replied: "I am a convict. I won't go to court about this." Deputy Abbott explained that he was not there to discuss whether defendant would go to court; he just wanted to know what had happened. Defendant repeated that he did not want to go to court and testify, but eventually told Deputy Abbott that he was a substitute janitor and had worked at the school for a few days. He discovered the victim's body and notified two other janitors, who notified the principal. During the interview, defendant pointed out that he had blood on himself. Deputy Abbott spoke to defendant for about 20 to 30 minutes, during which time an investigator collected a shirt that defendant had in his back pocket. Deputy Abbott then returned defendant to the backseat of the patrol car and went to interview another witness.

Following argument by the parties, the trial court denied defendant's motion to suppress evidence, finding that defendant had not been in custody when he was interviewed by Deputy Abbott.

"In reviewing constitutional claims of this nature, it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." (*People v. Cunningham* (2001) 25 Cal.4th 926, 992 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

■■■ In *Miranda*, the high court held, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement

officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda v. Arizona, supra*, 384 U.S. at p. 444.)

Defendant argues that he was in custody for purposes of *Miranda* when he was detained in the patrol car. But we need not decide whether defendant was in custody when he was in the backseat of the patrol car, because he was not questioned during that time. Even were we to conclude that defendant was in custody when he was detained in the patrol car, it does not necessarily follow that he remained in custody when he was released from the vehicle before he was interviewed.

In *People v. Holloway* (2004) 33 Cal.4th 96 [14 Cal.Rptr.3d 212, 91 P.3d 164], police officers learned that the defendant had been an acquaintance of the deceased rape victim and was on parole for assault. The officers contacted the local parole office. When the defendant arrived at the parole office for drug and alcohol testing, the parole officer on duty handcuffed him and telephoned the police officers, who said they wished to speak to the defendant and it would take about 20 minutes for them to arrive. When the officers arrived, they were surprised to find the defendant in handcuffs and immediately had him released. The defendant agreed to accompany them to the police station, where he was questioned and then driven home. We upheld the trial court's finding that *Miranda* warnings were not required because the defendant had not been in custody when he was questioned, holding that "no reasonable person would believe under these circumstances that he was compelled to accompany the officers or to remain with them during the interview." (*People v. Holloway, supra*, 33 Cal.4th at p. 120.)

The court in *In re Joseph R.* (1998) 65 Cal.App.4th 954 [76 Cal.Rptr.2d 887], held that a suspect was not in custody when questioned despite having previously been handcuffed and detained in a patrol vehicle. A citizen told a police officer that he had seen two boys throw rocks at a passing bus and then run into a residence. The officer went to the residence and told one of the boys that a witness had seen him throw a rock at a bus. When the boy denied any knowledge of the incident, the officer handcuffed him and placed him in the back of his patrol car for about five minutes. When the officer returned, he took the boy out of the vehicle and removed the handcuffs. The officer suggested it was " 'a pretty stupid thing' " to throw rocks at a bus, and the boy agreed, stating: " 'Yeah, it was a pretty dumb thing for us to do.' " (*Id.* at p. 957.)

The Court of Appeal ruled that the juvenile had not been in custody when he was questioned. The court reasoned that "because the time during which Joseph was restrained was extremely short, it seems likely he was handcuffed

and placed in the police car merely so the officer could maintain control of the minor while he carried on another portion of his investigation." (*In re Joseph R., supra*, 65 Cal.App.4th at p. 958.) It was reasonable for the officer to detain the juvenile "pending questioning, while he tended to other details of his investigation, to make sure the 14-year-old did not do something stupid like fleeing." (*Id.* at p. 958, fn. 4.) The court distinguished cases in which a suspect was questioned while being detained in a vehicle, stating: "This is not to say that the minor would not have been in custody for purposes of *Miranda* had he been questioned while he was still in the car and under the officer's control. In that case, the interrogation would have been accompanied by restraints that are normally associated with an arrest, thereby requiring *Miranda* warnings be administered. [Citations.]" (*Id.* at p. 958, fn. 5.)

In holding that Joseph was not in custody at the time he was questioned, the court relied upon the decision in *People v. Taylor* (1986) 178 Cal.App.3d 217 [223 Cal.Rptr. 638], which held that *Miranda* warnings were required when the suspect was questioned following a high-speed chase while being held at gunpoint surrounded by several officers with a police helicopter overhead. (*Taylor, supra*, at p. 229.) The Court of Appeal added: "We caution we do not suggest that *Miranda* warnings must be given in each instance where police officers initially use weapons or other force to effect an investigative stop. For *Miranda* purposes, we think the crucial consideration is the degree of coercive restraint to which a reasonable citizen believes he is subject *at the time of questioning*. Police officers may sufficiently attenuate an initial display of force, used to effect an investigative stop, so that no *Miranda* warnings are required when questions are asked." (*Id.* at p. 230.)

The trial court did not err in denying defendant's motion to suppress his statements made at the scene of the crime because he was not in custody for purposes of *Miranda* when he was questioned.

### 2. CALJIC No. 2.28

Defendant contends the trial court violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by instructing the jury pursuant to CALJIC No. 2.28 (6th ed. 1996) that defendant failed to timely disclose the evidence offered by defense expert witness Brent Turvey and that "[t]he weight and the significance of any delayed disclosure are matters for your consideration."

The "Witness List" filed by the defense on the second day of trial, July 10, 2000, included "Brent Turvey, M.S." On Friday, August 18, 2000, near the end of the People's case-in-chief, the prosecutor announced that he had received "no reports" from Turvey. The following Monday, defense counsel

explained that Turvey was a crime scene reconstruction expert who had been working in Alaska. Defense counsel had met with him on the previous Friday and they discussed "basically what his testimony would be." Defense counsel then left the prosecutor a voice mail message on Sunday stating he would provide a written summary of the witness's expected testimony the following day.

The prosecutor moved to exclude Turvey as a witness "for failure to comply with the discovery laws under [section] 1054." The prosecutor represented that defense counsel had given him the witness's resume and the prosecutor's investigator had contacted Turvey, but Turvey had refused to discuss his proposed testimony without defense counsel's approval. The prosecutor stated that he was not prepared to cross-examine the witness. At that point, defense counsel gave the prosecutor a two-page written summary of Turvey's proposed testimony. The trial court stated it would be a "drastic sanction" to exclude Turvey as a witness "at this point in the trial" and offered instead to grant the prosecutor a continuance to prepare for cross-examination. When the jury returned to the courtroom, the prosecution rested.

Defendant called Turvey as a witness during the afternoon session that day. Turvey testified that he holds a master's degree in forensic science and co-authored a book entitled "Criminal Profiling." He had reviewed the police reports in the present case, including photographs and one videotape, had reviewed the autopsy reports and photographs, and recently had visited the crime scene. Turvey surmised that defendant and the victim had engaged in sexual activity in the shop classroom near where the used tampon was left in the paper cup, and suggested that the victim had removed her tampon herself before the sexual activity, because it had been carefully placed in a paper cup, whereas a rapist would have discarded it on the floor. He further suggested the victim then moved a short distance to a more private place near where a tampon wrapper and the victim's purse were discovered, to replace her clothing and insert a new tampon, where she was killed.

Turvey testified the fact that no weapon was found in defendant's possession suggests that he used tools found in the shop as weapons, which suggests the murder was "a spontaneous act born . . . of anger." The lack of defensive wounds on the victim's hands indicates it was a surprise attack. The hasty attempts to conceal the evidence, such as wiping down the crowbar, indicate a lack of planning. Turvey used the term "overkill," which he defined as "an attack which involves more force than is necessary to subdue the victim, or in this case to kill the victim." He testified that the overkill and lack of planning showed that the apparent motivation for the attack was spontaneous unplanned anger, although he could not say what had provoked the anger. Turvey criticized the police investigation as "incomplete."

At the conclusion of Turvey's direct testimony, the court asked the prosecutor if he needed a continuance to prepare for cross-examination, and the prosecutor replied that he wished to begin cross-examination immediately. After Turvey was excused as a witness, the court discussed with counsel, outside the presence of the jury, whether to instruct the jury pursuant to the 1996 version of CALJIC No. 2.28. The court stated at one point that it was "leaning" against giving the instruction but later decided to give the instruction, describing it as "a relatively benign instruction" and "a lesser sanction" than excluding Turvey's testimony. The court found that "the People have, in fact, been prejudiced." Defendant counters that "there is no evidence that the prosecution was prejudiced by the late disclosure of Turvey's findings," noting that the prosecutor declined the court's offer of a continuance and extensively cross-examined the witness.

Section 1054.3, subdivision (a) provides: "The defendant and his or her attorney shall disclose to the prosecuting attorney: [¶] (1) The names and addresses of persons . . . he or she intends to call as witnesses at trial . . . including any reports or statements of experts made in connection with the case . . . ." Section 1054.5, subdivision (b), authorizes the court to "make any order necessary to enforce the provisions of this chapter," including "prohibiting the testimony of a witness," and further provides that "the court may advise the jury of . . . any untimely disclosure."

The court instructed the jury pursuant to the 1996 version of CALJIC No. 2.28 that "[t]he prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of the truth" and "[i]n this case, the Defendant has failed to timely disclose the following evidence: of Brent Turvey." The court further instructed the jury that "[t]he weight and significance of any delayed disclosure are matters for your consideration. However, you should consider whether the untimely disclosed evidence pertains to a fact of importance, something trivial or subject matters already established by other credible evidence."[4]

---

[4] The complete instruction was as follows: "The prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of the truth. Delay in the disclosure of evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the non-complying party's evidence. [¶] Disclosures of evidence are required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately. In this case, the Defendant has failed to timely disclose the following evidence: of Brent Turvey. [¶] Late disclosure of the evidence was without lawful justification; however, the Court has, under the law, permitted the production of this evidence during the trial. [¶] The weight and significance of any delayed disclosure are matters for your

Defendant points out that three decisions of the Court of Appeal have criticized the 1996 version of CALJIC No. 2.28. The court in *People v. Bell* (2004) 118 Cal.App.4th 249 [12 Cal.Rptr.3d 808] reversed the defendant's convictions of murder and attempted robbery because the court instructed the jury pursuant to the 1996 version of CALJIC No. 2.28 that the defendant had failed to timely disclose statements given by his alibi witnesses. Bell was identified in a photographic lineup, a live lineup, and at trial by two eyewitnesses. Bell claimed that he was out of town when the crime was committed and supported his alibi with the testimony of three witnesses. Defense counsel, however, had not given the prosecutor the statements of the alibi witnesses until 10 days before trial.

The Court of Appeal held that the trial court erred in instructing the jury pursuant to the 1996 version of CALJIC No. 2.28 that " 'the Defendant failed to timely disclose' " the statements of the witnesses, pointing out that "[t]he failure here belonged to counsel and his investigator" and "[i]t was misleading to suggest that 'the defendant' bore any responsibility . . . ." (*People v. Bell, supra*, 118 Cal.App.4th at pp. 254–255.) The instruction also was deficient in informing the jury that " '[t]he weight and significance of any delayed disclosure are matters for your consideration' " (*id.* at p. 254), because it offered "no guidance on how this failure might legitimately affect their deliberations" (*id.* at p. 255), pointing out that there was no evidence that the "tardy disclosure" had actually deprived the prosecutor "of the chance to subpoena witnesses or marshal evidence in rebuttal" (*ibid.*). Finally, the jury was not told that the discovery violation was insufficient of itself to prove guilt. "As a result, the jurors may have concluded they were free to find Bell guilty merely because he failed to comply with the discovery statute." (*Id.* at p. 256.)

The error in *Bell* was prejudicial. "The prosecution's case was not overwhelming. There was no physical evidence tying Bell to the murder scene." (*People v. Bell, supra*, 118 Cal.App.4th at p. 257.) One of the two eyewitnesses had seen the assailant for less than 20 seconds and "[t]he credibility of the other was impeached by the admission of evidence that she was a frequent liar and had suffered prior misdemeanor convictions." (*Ibid.*) The alibi witnesses were "a critical part of Bell's case" and the prosecutor relied upon the delay in disclosing the statements of the witnesses and on the 1996 version of CALJIC No. 2.28 during closing argument. (*Bell, supra*, at p. 257.)

The Court of Appeal in *People v. Cabral* (2004) 121 Cal.App.4th 748 [17 Cal.Rptr.3d 456] followed the decision in *Bell* and reversed the defendant's

consideration. However, you should consider whether the untimely disclosed evidence pertains to a fact of importance, something trivial or subject matters already established by other credible evidence."

conviction of forging a check provided by his employer to pay for a business expense by cashing the check and keeping the proceeds. The court held it was reversible error to instruct the jury pursuant to the 1996 version of CALJIC No. 2.28 that it could consider the " 'weight and significance' " of defense counsel's delayed disclosure of the testimony of the defendant's wife that the defendant had permission to cash the check. (121 Cal.App.4th at p. 753.)[5]

But the Court of Appeal in *People v. Saucedo* (2004) 121 Cal.App.4th 937 [17 Cal.Rptr.3d 692] ruled that the trial court's error in instructing the jury pursuant to the 1996 version of CALJIC No. 2.28 did not require reversal of the resulting conviction. Saucedo and a companion robbed three men at gunpoint and beat them severely. After the trial had begun, defense counsel informed the prosecutor that Saucedo's mother and sister would testify as alibi witnesses. The court permitted the testimony but instructed the jury pursuant to the 1996 version of CALJIC No. 2.28.

The Court of Appeal recognized that the 1996 version of CALJIC No. 2.28 was "a problematic jury instruction" (*People v. Saucedo, supra,* 121 Cal.App.4th at p. 942) and shared the concerns expressed in the decisions in *Bell* and *Cabral.* Further, the court "question[ed] the appropriateness of injecting matters of compliance with pretrial procedure rules into the jury's evaluation of the evidence and deliberations on substantive offenses." (*People v. Saucedo,* at p. 943.) Nevertheless, the Court of Appeal ruled that the error was harmless because the 1996 version of CALJIC No. 2.28 "was merely a vehicle for credibility challenges that would have been made even in the absence of the instruction" (*People v. Saucedo,* at p. 943), pointing out that the prosecutor focused in argument on the last-minute nature of Saucedo's alibi defense and on the credibility of the witnesses rather than on the discovery violation. The court concluded, "it was not CALJIC No. 2.28 that made the alibi defense implausible but its inexplicable materialization . . . like Botticelli's Venus emerging fully formed from the sea . . . ." (*People v. Saucedo, supra,* 121 Cal.App.4th at p. 944.)

This court has not addressed the propriety of the 1996 version of CALJIC No. 2.28, but in *People v. Riggs* (2008) 44 Cal.4th 248 [79 Cal.Rptr.3d 648, 187 P.3d 363] we discussed a precursor to that instruction. After the trial in *Riggs* had begun and the prosecution had completed its case-in-chief, the defendant disclosed to the prosecutor that he intended to present two alibi

---

[5] The Court of Appeal in *People v. Lawson* (2005) 131 Cal.App.4th 1242 [32 Cal.Rptr.3d 634] reversed the defendant's conviction for possession of cocaine base because the trial court not only erroneously instructed the jury pursuant to the 1996 version of CALJIC No. 2.28 that the defense failed to provide discovery, but also excluded the defendant's sole witness from testifying, thereby forcing the defendant to testify and allowing the prosecutor to impeach the defendant with his prior convictions.

witnesses. The trial court permitted the witnesses to testify, but instructed the jury that " '[t]here has been evidence presented to you from which you may find that there was a failure by the defense to provide timely notice to the prosecution of the names and addresses of [the alibi witnesses]. [¶] You may consider such failure, if any, in determining the weight to be given to the testimony of such witnesses. The weight to be given such failure is entirely a matter for the jury's determination.' " (*Id.* at pp. 304–305.) We held that the trial court did not err in giving this instruction and, in any event, any such error was harmless.

We distinguished the Court of Appeal decision in *Bell.* One concern expressed in *Bell* was that "[i]t was misleading to suggest that 'the defendant' bore any responsibility" for his attorney's failure to provide discovery (*People v. Bell, supra,* 118 Cal.App.4th at p. 255), but in *Riggs,* the defendant had represented himself at trial (*People v. Riggs, supra,* 44 Cal.4th 248, 307). We also relied upon the fact that the jury instruction in *Riggs* "limited the inferences the jury could draw by expressly directing the jury that it could consider a discovery violation in assessing the weight of the alibi testimony." (*Ibid.*)

In any event, we concluded that any error in giving the instruction was harmless because the evidence of guilt "was entirely overwhelming, especially in comparison to the exceedingly dubious alibi testimony provided by defendant's family members. [Citation.]" (*People v. Riggs, supra,* 44 Cal.4th 248, 311.) And the challenged jury instruction "was but a small part of the prosecution's devastating arguments concerning the credibility of the alibi testimony." (*Ibid.*)

Unlike the instruction given in *Riggs,* the instruction in the present case was based upon the 1996 version of CALJIC No. 2.28 and suffers from many of the same deficiencies identified in *Bell.* As in *Bell,* "[i]t was misleading to suggest that 'the defendant' bore any responsibility" (*People v. Bell, supra,* 118 Cal.App.4th at p. 255) for his attorney's failure to provide discovery, and the instruction also was deficient in informing the jury that " '[t]he weight and significance of any delayed disclosure are matters for your consideration,' " because it offered "no guidance on how this failure might legitimately affect their deliberations" (*ibid.*). As in *Bell,* there was no evidence that the "tardy disclosure" had actually deprived the prosecutor "of the chance to subpoena witnesses or marshal evidence in rebuttal." (*Ibid.*)

The prosecutor declined the trial court's offer of a continuance and vigorously cross-examined the expert witness. We conclude, therefore, that the trial court erred in instructing the jury pursuant to the 1996 version of CALJIC No. 2.28.[6]

We further conclude, however, that this error does not require reversal of the conviction, because it is not reasonably probable that an outcome more favorable to defendant would have resulted absent the error (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]), and any federal constitutional error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]). The evidence that defendant had sexual intercourse with the victim and then killed her was overwhelming, so much so that defendant did not dispute either fact. Defendant's primary defense was that he did not murder the victim during the commission of rape, because the victim had consented to sexual intercourse. This scenario, while not impossible, was highly improbable and supported by only flimsy evidence. It strains credulity to imagine that a bright, athletic, popular student who was in her menstrual period would consent, within a few minutes, to have intercourse on the dirty floor of a shop classroom with a substitute janitor nearly twice her age whom she had just met. The only evidence to which defendant could point to support this theory was that the tampon that had been removed from the victim prior to intercourse was found in a cup rather than on the floor, the victim had inserted a new tampon before she was murdered, the victim might had gotten dressed a short distance from where she was murdered, and there was no trauma to her genitalia.

There is nothing to indicate that the jury instruction based upon the 1996 version of CALJIC No. 2.28 affected the jury's deliberations. The prosecutor did not mention the instruction during his argument or refer to the delay by the defense in providing discovery. The case was not close, and the jury reached its verdict after about one full day of deliberations. We therefore conclude that the error was harmless.

### 3. *Videotape of Defendant*

Defendant contends the trial court violated Evidence Code section 352 and denied him his rights to due process and a fair trial under the Fifth, Eighth and Fourteenth Amendments to the federal Constitution by admitting into evidence a videotape of defendant unzipping his pants and examining his genitals while being held in an interrogation room at the jail.

---

[6] CALJIC No. 2.28 has since been modified to address the concerns expressed in *People v. Bell, supra,* 118 Cal.App.4th 249 and its progeny. (CALJIC 2.28 (Fall 2010 ed.); see also CALCRIM No. 306.)

 Evidence Code section 352 vests a trial court with discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." "A trial court's exercise of discretion in admitting or rejecting evidence pursuant to Evidence Code section 352 'will not be disturbed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice.' [Citation.]" (*People v. Cain* (1995) 10 Cal.4th 1, 33 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

Prior to trial, defendant moved to exclude a videotape taken of him while he was alone in an interview room at the jail shortly after his arrest. Defendant is shown unzipping his pants and examining his pelvic area. A second segment recorded less than an hour later shows defendant again inspecting his pelvic area and then raising his hands to his nose several times.

Defendant argued that the videotape should be excluded under Evidence Code section 352 because it had no probative value, would be cumulative to the DNA evidence that defendant's sperm was recovered from the victim's vagina, and would be "*gratuitously inflammatory.*" The trial court denied the motion to exclude the evidence, ruling that "the probative value substantially outweighs any substantial danger of undue prejudice to the defendant."

 Defendant argues that the videotape had little or no probative value because defense counsel had conceded in his opening statement that defendant had had sexual intercourse with the victim. Even though defendant did not contest at trial that he had engaged in sexual intercourse with the victim, "he pleaded not guilty to the charges, thereby putting in issue ' "all of the elements of the offenses." ' [Citation.] . . . [¶] . . . ' "As we have said, even where the defendant concedes some aspect of a criminal charge, the prosecution is entitled to bolster its case, which requires proof of the defendant's guilt beyond a reasonable doubt, by presenting evidence of the defendant's consciousness of guilt." ' [Citation.]" (*People v. Burney* (2009) 47 Cal.4th 203, 245 [97 Cal.Rptr.3d 348, 212 P.3d 639].) The videotape showing defendant apparently checking himself for evidence that he had had sexual intercourse with the victim was highly relevant to show his consciousness of guilt.

Defendant argues that the videotape was unduly prejudicial because defendant's "actions in examining and handling his penis . . . may well have been viewed by some jurors as perverse or deviant behavior." The trial court's finding that defendant's actions did not resemble masturbation or exhibitionism is supported by substantial evidence. The trial court did not abuse its discretion in ruling that the probative value of the videotape outweighed any prejudicial effect.

### 4. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct during his closing argument at the guilt phase of the trial by telling the jury that if they did not find the special circumstances allegation true, defendant could be sentenced to life in prison with the possibility of parole.

During his closing argument at the guilt phase of the trial, the prosecutor said: "The defense strategy in this case is to beat the special circumstance. If you don't find Mr. Thomas guilty of rape, they win the case. . . . [I]f you don't find him guilty of rape, and don't find the special circumstance to be true, that's a win for Mr. Thomas. Life in prison with the possibility of parole." Defendant did not object. The prosecutor completed his argument and the court recessed for lunch.

When the court reconvened, defendant objected to the prosecutor's argument outside the presence of the jury and asked that the jury be given the standard instruction not to consider punishment in determining defendant's guilt. The prosecutor responded that he did not concede that his argument was improper, but he had no objection to the court's giving the standard jury instruction. With the agreement of both parties, the court brought in the jury and, after observing that "it's been asserted that [the prosecutor] referred to punishment in a portion of his closing argument," instructed the jury "that in the consideration of guilt or lack of guilt the jury cannot be influenced by punishment." The trial judge added that he would "read you formal instructions on that issue at a later time." As part of the jury instructions at the conclusion of the guilt phase, the court instructed the jury pursuant to CALJIC No. 8.83.2 as follows: "In your deliberations the subject of penalty or punishment is not to be discussed or considered by you. That is a matter which must not in any way affect your verdict or affect your finding as to the special circumstance alleged in this case."

█ It was improper for the prosecutor to argue to the jury that defendant could be released on parole if it did not find the special circumstances allegation true. The prosecutor in *People v. Holt* (1984) 37 Cal.3d 436 [208 Cal.Rptr. 547, 690 P.2d 1207] argued to the jury that if it did not find that the defendant murdered the victim during the commission of a robbery it " 'just guaranteed [the defendant] a parole date.' " (*Id.* at p. 457, fn. 14, italics omitted.) We held: "A defendant's possible punishment is not a proper matter for jury consideration. [Citation.] '[T]he jury is not allowed to weigh the possibility of parole or pardon in determining the guilt of the defendant . . . .' [Citation.]" (*Id.* at p. 458.)

The prosecutor's improper argument, however, did not prejudice defendant. In *Holt*, we observed that "[a]n admonishment to the jury that they were not to consider the question of penalty might have had a curative effect," but "no admonishment was given." (*People v. Holt, supra*, 37 Cal.3d at p. 458.) The same is not true here. The trial court instructed the jury as requested by defendant that it "cannot be influenced by punishment" in determining defendant's guilt. The court reiterated this admonishment in its instructions to the jury. In *People v. Stevens* (2007) 41 Cal.4th 182 [59 Cal.Rptr.3d 196, 158 P.3d 763], the prosecutor argued to the jury that if it found the defendant guilty of second degree murder the jury "can never find him guilty of the special circumstance. And they save his life . . . ." (*Id.* at p. 205.) The defendant objected and the trial court admonished the jury to disregard the prosecutor's comment. The court later instructed the jury not to consider penalty or punishment in its deliberations. We affirmed the resulting judgment of conviction, concluding there was "no reasonable likelihood the remark misled the jury as to whether it could consider punishment in its guilt deliberations. [Citation.]" (*Ibid.*) We also presumed that the jury followed the court's instruction not to consider penalty in determining the defendant's guilt. (*Id.* at p. 206.)

The trial court in the present case admonished the jury shortly after the prosecutor's argument not to be influenced by punishment in determining defendant's guilt, and later instructed the jury to the same effect. We presume the jury followed these instructions.

Defendant also argues that the prosecutor improperly expressed his personal belief that the death penalty was the only appropriate punishment by arguing: "It is important that you hold Mr. Thomas responsible at the appropriate level. You have to put the right label on it. We have to call this crime what it was. It's a first degree murder and rape."

A prosecutor may not "express a personal opinion or belief in a defendant's guilt, where there is substantial danger that jurors will interpret this as being based on information at the prosecutor's command, other than evidence adduced at trial." (*People v. Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564].) But the prosecutor in this case did not express his personal belief and did not suggest that his remarks were based upon evidence that was not admitted at trial.

### 5. *Photographs of Defendant's Tattoos*

Defendant contends the trial court violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution by admitting

into evidence several photographs of defendant taken on the day of the murder that depict his many tattoos.

Following defense counsel's opening statement in which he stated that the defense theory was that defendant had had "consensual sex" with the victim before he murdered her, the prosecutor asserted outside the presence of the jury that "defendant's appearance on that day is now in issue" and announced his desire to "show photos of what he looked like on that day." Defense counsel responded that there was no need to introduce photographs because defendant was sitting 25 feet from the jury and no effort had been made to conceal his tattoos. The trial court tentatively ruled that the probative value of photographs of defendant taken shortly after the crime would outweigh any prejudice, noting that the jury did not have the opportunity to view defendant in as close proximity as had the victim. The following day, the trial court made its final ruling that the probative value of evidence of defendant's appearance on the day of the crime "far outweighs the prejudicial value."

The prosecution later introduced several photographs of defendant taken a few hours after he was arrested. He is wearing denim jeans and a white T-shirt. A shot of his head and torso shows a faint "107" tattooed in large numbers on his forehead and several tattoos on his chest and arms. A closeup of his head shows a tattoo of a teardrop on his neck and another tattoo of "107" on his neck. Closeup photographs of defendant's arms depict numerous tattoos, including another "107." The court instructed the jury that the photographs "can only be used on the issue of consent. In other words, what [the victim] actually could see on the day in question. You cannot use it for any other issue or purpose other than the issue of consent."

"It is within a trial court's discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. (Evid. Code, § 352.) Our review on this issue is deferential. A trial court's decision whether to exclude evidence pursuant to Evidence Code section 352 is reviewed for abuse of discretion." (*People v. Mendoza* (2007) 42 Cal.4th 686, 699 [68 Cal.Rptr.3d 274, 171 P.3d 2].)

Defendant argues that the photographs were inherently prejudicial because they constituted "gang evidence," citing decisions such as *People v. Cardenas* (1982) 31 Cal.3d 897, 904 [184 Cal.Rptr. 165, 647 P.2d 569], in which evidence was introduced that the defendant was a member of a criminal street gang. But in the present case, no evidence was introduced to show that defendant's tattoos indicated he was a member of a gang. Defendant cites no

authority, and we are aware of none, that holds that evidence of a defendant's tattoos, standing alone, constitutes evidence of membership in a gang. (Cf. *People v. Medina* (2009) 46 Cal.4th 913, 918 [95 Cal.Rptr.3d 202, 209 P.3d 105] [gang tattoos plus testimony of a gang expert].)

█ Even if it was apparent to the jury that defendant's tattoos indicated that he was a member of a gang, the trial court instructed the jury that the photographs "can only be used on the issue of consent" and not for any other purpose. We presume the jury followed the court's instructions. (*People v. Thompson* (2010) 49 Cal.4th 79, 138 [109 Cal.Rptr.3d 549, 231 P.3d 289].)

In light of the defense theory that the victim voluntarily consented to have sexual intercourse with defendant, evidence of defendant's appearance at the time was highly probative. The trial court did not abuse its discretion in admitting the photographs into evidence.

### 6. Cumulative Error

Defendant asserts that the cumulative impact of the errors he claims occurred at the guilt phase of trial violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. As explained above, the only errors that occurred during the guilt phase of the trial were that the trial court instructed the jury pursuant to the 1996 version of CALJIC No. 2.28 (see *ante*, at pp. 483–484) and the prosecutor improperly argued to the jury that defendant could be released on parole if it did not find the special circumstances allegation true (see *ante*, at p. 486). As explained above, neither of these errors, standing alone, requires reversal of the judgment. Neither error increases the impact of the other and their cumulative impact did not deprive defendant of a fair trial or his right to due process of law.

### C. Penalty Phase Issues

### 1. Absence of Defense Witnesses

Defendant claims that the trial court erred in barring his investigator from testifying to explain why certain witnesses did not testify for the defense, which violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

Defendant called as a witness Dr. Gretchen White, a forensic clinical psychologist, who prepared a "psychosocial history" of defendant starting from when his great-great-grandmother had been born into slavery. Defendant's mother drank heavily, left her husband when defendant and his brothers were young, and moved with her sons to South Central Los Angeles where

she collected welfare. Defendant's home was "poorly kept." His mother often was intoxicated and would yell at her children, throw things at them, and demand money from them even though she knew their only source of income was theft. Dr. White formed the opinion that defendant's family "was extremely dysfunctional."

On cross-examination, the prosecutor questioned Dr. White about the reliability of some of the family members she had interviewed, and Dr. White agreed that "There were many people that I didn't feel were completely reliable historians." She also agreed with the prosecutor that "[w]e have to rely on your good judgment to present a balanced picture . . . . [¶] Because all these other people that you're talking about . . . all these family members of Mr. Thomas who had direct observation of what life was like growing up in the Thomas household they haven't come to court to testify, have they?" The prosecutor established that only one of defendant's cousins had testified and neither his father nor his brothers had testified. Defendant did not object.

Dr. White agreed that defendant's family members "were extremely eager to provide information that they perceived as helpful to Mr. Thomas in this trial" and she had to "assess the reliability" of the information they provided because "they were, you know—of course, they're very fond of him and, yes, I would feel that they are biased toward him." Dr. White conceded that interviewing family members "is a very different atmosphere" than "obtaining testimony under oath or statements under the formal circumstances of like an oath, a requirement to tell the truth." Defendant did not object.

After the defense case was completed, the court and counsel discussed jury instructions outside the presence of the jury. The prosecutor said he was sure he had included an instruction concerning the failure to call all logical witnesses but would "request that if it's not already in there," and the following colloquy occurred.

"[Defense counsel]: Your Honor, regarding the failure to call all logical witnesses we—it was my intent to call our investigator . . . to testify perhaps at a later phase and I thought just to make a record not for any particular purpose but to make a record of what we had done to secure the attendance of these people and some of them are very ill, of course some of them are dead, and there are just a whole variety of problems with getting the witnesses to come and I'm a little bit leery of—I'll have to look at the instruction but if that's going to be held against us—

"THE COURT: No. No. I think—no. What we're saying is that neither side is required to call all witnesses. That's the same one I read in the guilt phase.

"[Defense counsel]: Okay.

"THE COURT: What I think is being said is that was not included in his packet.

"[Prosecutor]: Right.

"THE COURT: And it ought to be.

"[Defense counsel]: Okay.

"THE COURT: No, we weren't—I wasn't suggesting that counsel is going to be able to argue that you should have had all those people here."

Defendant now asserts that "the defense moved to call its investigator to testify before the jury as to why certain witnesses did not testify in court" and argues that the trial "court erred in excluding the defense investigator's testimony." This is not a fair characterization of the record. When the prosecutor asked for an instruction concerning the failure to call all logical witnesses, defense counsel mentioned that he had intended to call his investigator as a witness and expressed concern that the instruction requested by the prosecutor would mean that defendant's failure to call certain witnesses was "going to be held against us." The court interjected to assure defense counsel that the court would instruct the jury only that "neither side is required to call all witnesses." This apparently satisfied defense counsel and he moved on to another topic. Defendant never moved to reopen the evidentiary portion of the penalty phase and never called his investigator as a witness. Consequently, the court never was called upon to rule upon these issues. There was no error.

Defendant also relies upon the court's remark that it was not "suggesting that counsel is going to be able to argue that you should have had all those people here," and complains that the prosecutor later did argue that defendant's mitigating evidence was "not very reliable" because the jury had "not heard from the best witnesses on this point" and stated: "You would think that one of his brothers would come in to talk about him if there was something good to say about Alex Thomas." Later, the prosecutor reiterated: "If there were witnesses out there who had good things to say about Alex Thomas, who could provide evidence that you could consider on his behalf, they would have been here."

Defendant did not object to the prosecutor's remarks and, thus, has forfeited this claim. " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' " (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656,

952 P.2d 673].) In any event, the prosecutor's remarks were proper. "The prosecutor was entitled to comment on the defense's failure to call witnesses other than defendant." (*People v. Taylor, supra*, 48 Cal.4th 574, 633.)

### 2. *Prosecutorial Misconduct*

Defendant argues that several instances of prosecutorial misconduct deprived him of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Defendant contends the prosecutor committed misconduct by arguing, as noted above, that defendant's mitigating evidence was "not very reliable" because the jury had "not heard from the best witnesses on this point," and by commenting upon defendant's failure to call logical witnesses, such as defendant's brothers, stating: "If there were witnesses out there who had good things to say about Alex Thomas . . . they would have been here."

Defendant argues that this constituted misconduct because the prosecutor knew defendant wanted to introduce evidence explaining why he had not called certain witnesses, but had been prevented from doing so by the court's denial of his motion to call his investigator as a witness. As explained above, however, defendant never moved to call his investigator as a witness and the court, accordingly, did not deny such a motion. Defendant's argument that the prosecutor committed misconduct is based upon an erroneous premise.

Defendant also forfeited this issue by failing to object to the prosecutor's argument at trial. (*People v. Hill, supra*, 17 Cal.4th 800, 820.) Defendant asserts an objection would have been futile because the court already had denied defendant's motion to call his investigator as a witness. As explained above, the court did not make such a ruling. Defendant further argues that he was not required to object because no admonition could have cured the harm. Defendant cites no authority in support of this contention and we are aware of none. (See *People v. Champion* (1995) 9 Cal.4th 879, 940 [39 Cal.Rptr.2d 547, 891 P.2d 93] ["any conceivable prejudice . . . could have been cured by a timely objection and admonition"].)

Defendant's second claim of misconduct was preserved for review by a timely objection. At a hearing outside the presence of the jury, the prosecutor called Vincent McCowan, who was in custody serving a life sentence, to testify that defendant had attacked him while they both were in jail. McCowan acknowledged having been in the Los Angeles County jail in 1985

but then declined to make any further statement, explaining that he was scheduled to appear for sentencing the following month in federal court and did not "want to say anything that is going to jeopardize my case." McCowan expressed a concern for his safety, saying: "I don't think anyone can promise me my safety at this point because I'm still incarcerated. Anything can happen." He stated that he would testify only if he were released from prison. When the prosecutor later asked, outside the presence of the jury, if he was afraid to be labeled a "snitch," he replied: "You could say that."

Defense counsel expressed concern that McCowan not be permitted to refuse to testify before the jury, because the jury would infer he was afraid of defendant. The prosecutor proposed that the court inform the jury that McCowan refused to testify and direct the jury not to speculate concerning the reasons for his refusal. The prosecutor further stated that he would not "argue that the jury should infer something from his refusal."

Rather than call McCowan as a witness, the prosecutor called Monrovia Police Officer Lee Woods, who in 1985 was a Los Angeles County deputy sheriff working at the Men's Central Jail. McCowan was present in court, but did not speak, and Officer Woods pointed out a scar on McCowan's neck that extended from his Adam's apple almost to his left ear. McCowan then was removed from the courtroom and Officer Woods testified that on the morning of July 4, 1985, he heard defendant, who was a member of the Crips street gang, yell "Cripin' for real" several times, and saw McCowan a few feet from defendant's cell holding an open wound on his neck. Defendant was holding what appeared to be a toothbrush handle. Officer Woods testified that inmates sometimes insert razor blades into toothbrush handles to use as weapons. Officer Woods called for assistance. When Deputy Sheriff Richard Calzada arrived, he asked McCowan what had happened, and McCowan replied: "Thomas in cell nineteen cut me." McCowan was bleeding, but not heavily.

Thereafter, the parties discussed how the jury should be instructed regarding McCowan's refusal to testify. The prosecutor argued that there was "evidence in the record of this case which would permit the inference to be drawn that Mr. McCowan refuses to testify for fear of his own safety." The court instructed the jury that it was "allowed to consider the fact that Mr. McCowan refused to testify concerning the occasion when he sustained the injury to his neck. In hearings outside your presence Mr. McCowan refused to answer questions even when told by me that he would be held in contempt of court. The evidence has already shown that Mr. McCowan is currently serving a life sentence in prison. As a practical matter, the Court can do nothing more to convince Mr. McCowan to testify. You cannot draw any inference from Mr. McCowan's refusal to testify."

Sergeant Gerald Franks testified that he was a correctional officer with California's Department of Corrections (now Department of Corrections and Rehabilitation) and had interviewed McCowan when McCowan was sent to prison. McCowan had listed defendant as an "enemy," explaining that defendant had cut him on the neck.

Clark Mason, a newspaper reporter for the Santa Rosa Press Democrat, testified that he recently had interviewed defendant, who said that he expected a man whose throat he had slashed when they both were in jail to testify against him at the penalty phase of his trial. Defendant explained that the man was a "snitch" and defendant was the only one he had trusted enough to let him get close.

During argument, the prosecutor recounted Mason's testimony that defendant smiled as he explained that he expected a man whose throat he had slashed was going to testify against him, adding: "Talk about remorse. Fifteen years later, ladies and gentlemen, he's boasting about it." The prosecutor further stated: "Vincent McCowan didn't testify because he wouldn't. . . . He didn't testify probably because he doesn't want to be a snitch; doesn't want to go back to prison being known to have testified against Mr. Thomas. He is afraid. And Mr. Thomas is proud of it. He is proud of the fact that he can intimidate Vincent McCowan." The trial court overruled defendant's objection that the prosecutor was arguing facts outside the record, and the prosecutor continued: "I am pointing out that he boasted to Mr. Mason, the reporter for the Press Democrat. . . . He boasted about trying to kill Vincent McCowan."

██ Defendant asserts that the prosecutor committed misconduct by arguing facts that were outside the record, thus denying him his Sixth Amendment right to confront and cross-examine witnesses. "While counsel is accorded 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation],' counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]." (*People v. Valdez* (2004) 32 Cal.4th 73, 133–134 [8 Cal.Rptr.3d 271, 82 P.3d 296].) Defendant argues that no evidence was admitted explaining why McCowan refused to testify.

The prosecutor was permitted to draw reasonable inferences from the fact that defendant had admitted to a reporter that he had slashed McCowan's throat because McCowan was a snitch. It was reasonable for the prosecutor to infer from this evidence that McCowan "didn't testify probably because he doesn't want to be a snitch" and was afraid "to go back to prison being known to have testified against Mr. Thomas." It also was reasonable for the prosecutor to characterize as boasting defendant's admission to the reporter

that he had attacked McCowan and to draw the inference that defendant was proud of having slashed McCowan's throat. Finally, it was reasonable for the prosecutor to infer that defendant was proud that his earlier attempt to kill McCowan for being a snitch had made McCowan too intimidated to testify against him. There was no prosecutorial misconduct.

### 3. *Evidence That McCowan Identified Defendant as His Attacker*

Defendant argues the trial court violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by admitting into evidence Vincent McCowan's out-of-court statement identifying defendant as the man who slashed his throat.

As noted above, when Deputy Calzada asked McCowan what had happened, McCowan replied: "Thomas in cell nineteen cut me." Deputy Calzada described McCowan as "obviously distressed." Over defendant's hearsay objection, the trial court admitted McCowan's statement as a spontaneous statement.

Defendant first argues that McCowan's statement was not properly admitted as a spontaneous statement under Evidence Code section 1240, which states: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." " 'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318 [246 Cal.Rptr. 886, 753 P.2d 1082].) "Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.] The determination of the question is vested in the court, not the jury. [Citation.] In performing this task, the court 'necessarily [exercises] some element of discretion . . . .' [Citation.]" (*Ibid.*)

Defendant argues that McCowan's identification of defendant was not spontaneous because it was "made in response to questioning, after the incident occurred." " 'Neither lapse of time between the event and the

declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*' [Citation.]" (*People v. Poggi, supra,* 45 Cal.3d at p. 319.) In *Poggi,* the victim's identification of her attacker in response to questioning by a police officer 30 minutes after the incident was held to be spontaneous. (*Id.* at pp. 319–320.)

In the present case, McCowan identified defendant minutes after he was attacked when he still was bleeding and "obviously distressed." "[T]he discretion of the trial court is at its broadest" when it determines whether an utterance was made while the declarant was still in a state of nervous excitement. (*People v. Poggi, supra,* 45 Cal.3d at p. 319.) The trial court in the present case did not abuse that discretion.

██ Defendant also asserts that admitting McCowan's out-of-court statement violated his right to confront the witnesses against him under the decision in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354], which held that admission of a "testimonial" out-of-court statement violates the confrontation clause unless the defendant had a prior opportunity to cross-examine the declarant. "While the high court declined to precisely define what constitutes a 'testimonial' statement, it held that, at a minimum, testimonial statements include 'prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations.' [Citation.] The court explained that the confrontation clause addressed the specific concern of '[a]n accuser who makes a formal statement to government officers' because that person 'bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.' [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 812–813 [89 Cal.Rptr.3d 225, 200 P.3d 847].)

In *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266], the high court held that a victim's out-of-court statements made to a 911 operator were not "testimonial," explaining: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822.)

The present case is similar to *People v. Cage* (2007) 40 Cal.4th 965, 972 [56 Cal.Rptr.3d 789, 155 P.3d 205], in which a treating emergency room physician asked the victim " 'what happened.' " The victim responded that " 'he

had been held down by his grandmother and cut by his mother.' " (*Ibid.*) We held: "Objectively viewed, the primary purpose of the question, and the answer, was not to establish or prove past facts for possible criminal use, but to help Dr. Russell deal with the immediate medical situation he faced. It was thus akin to the 911 operator's emergency questioning of [the victim] in *Davis*." (*Id.* at p. 986.)

We compared the physician's question to the interrogation performed in the hospital emergency room by a deputy sheriff, which produced testimonial responses. We held that the deputy sheriff was not responding to an ongoing emergency situation: "[B]y the time [the deputy sheriff] spoke with [the victim] in the hospital, the incident that caused [the victim]'s injury had been over for more than an hour. The alleged assailant and the alleged victim were geographically separated, [the victim] had left the scene of the injury, and . . . was in no danger of further violence as to which contemporaneous police intervention might be required." (*People v. Cage, supra*, 40 Cal.4th at p. 985.)

In the present case, Deputy Calzada responded to a request for assistance, found McCowan with his throat slashed, and asked what happened. Like the 911 operator in *Davis*, Deputy Calzada was responding to an emergency situation. Like the emergency room physician in *Cage*, he asked the victim a simple question to determine what had occurred so he could determine what needed to be done to address the situation. Deputy Calzada did not conduct a formal interrogation, and McCowan's response was not testimonial within the meaning of *Crawford*.

### 4. Testimony of Sergeant Franks

Defendant argues the trial court violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution by permitting Sergeant Gerald Franks of California's Department of Corrections to testify that, while in prison, defendant admitted assaulting Vincent McCowan. Specifically, defendant argues he was in custody when he was questioned and should have been given the warnings required by *Miranda v. Arizona, supra*, 384 U.S. 436.

At a hearing outside the presence of the jury, Sergeant Franks testified that on May 15, 1986, he was working as a correctional counselor for the Department of Corrections. He identified documents he had authored reflecting that he conducted an "initial processing interview" of Vincent McCowan when McCowan was transferred from county jail to prison. Sergeant Franks did not remember conducting that interview, but testified that he had written a report within 30 minutes of conducting it and described his standard custom and practice in conducting such interviews.

Sergeant Franks asked McCowan if he had any enemies in the prison system, and McCowan replied that defendant was an enemy because he had slashed McCowan's throat while they were both in county jail. Sergeant Franks observed a recent scar on McCowan's neck. Sergeant Franks then summoned defendant to his office to verify the information he had received from McCowan. Because he was in "a secured facility," defendant was released from his cell and walked unescorted to Sergeant Franks's office without being shackled or otherwise restrained. Sergeant Franks did not administer *Miranda* warnings and defendant "somewhat reluctantly" admitted that he had assaulted McCowan in county jail.

Defendant argued that his admission should have been excluded from evidence because he had not been advised of his rights as required by the decision in *Miranda v. Arizona, supra,* 384 U.S. 436. The trial court ruled that the decision in *Miranda* did not apply because defendant "was not interrogated for prosecutorial reasons."

We need not decide whether defendant should have been advised of his *Miranda* rights because any error in admitting into evidence defendant's admission to Sergeant Franks was harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [113 L.Ed.2d 302, 111 S.Ct. 1246]; *Chapman v. California, supra,* 386 U.S. 18, 24.) Sergeant Franks's testimony that defendant reluctantly admitted assaulting McCowan was cumulative to other, stronger evidence establishing that fact. Officer Woods testified that he observed McCowan with his throat slashed. Defendant was the only other person in the immediate vicinity; he was holding an object that could have been a weapon and was yelling a gang slogan. Deputy Calzada testified that McCowan told him "Thomas in cell nineteen cut me." The jury was permitted to observe the scar on McCowan's neck. A newspaper reporter testified defendant told him that he expected a man whose throat he had slashed when they both were in jail to testify against him at the penalty phase of his trial. Defendant explained that the man was a "snitch" and defendant was the only one he trusted enough to get close to him. In light of this evidence, we conclude beyond a reasonable doubt that the admission of defendant's admission to Sergeant Franks that he assaulted McCowan, even if erroneous, was harmless beyond a reasonable doubt.

### 5. *Ricardo Jones's Preliminary Hearing Testimony*

Defendant contends the trial court violated his rights to due process, to confront witnesses, and to a reliable death penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by erroneously admitting into evidence a transcript of the preliminary hearing testimony of Ricardo Jones.

During the penalty phase, the People introduced as evidence in aggravation defendant's 1985 prior conviction for voluntary manslaughter. The prosecutor attempted to have Ricardo Jones testify to describe the circumstances of the offense, but was unable to locate him and instead offered into evidence a reporter's transcript of Jones's testimony at the preliminary hearing. (§ 190.3, factor (a).) Defendant objected that this violated his right under the federal Constitution "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.; see Cal. Const., art. I, § 15.)

District attorney investigators Mark Rall and Lodric Clark described their two-month effort to secure Jones's appearance at trial. They telephoned Jones numerous times, attempted to arrange his transportation to the courthouse, issued two subpoenas and a bench warrant, conducted local, state and federal record checks on his name and aliases, canvassed Jones's last known whereabouts, met with individuals who knew him, and talked to Jones's sister. Jones's sister informed Clark that her brother was an alcoholic and a drug addict and advised him on where he might search, initially assuring Clark that she would be able to locate Jones.

The trial court found that the prosecution had exercised due diligence and permitted the reporter's transcript of Jones's preliminary hearing testimony to be read to the jury.

 A criminal defendant's Sixth Amendment right "to be confronted with the witnesses against him" is not absolute. (U.S. Const., 6th Amend.; *Chambers v. Mississippi* (1973) 410 U.S. 284, 295 [35 L.Ed.2d 297, 93 S.Ct. 1038]; *People v. Cromer* (2001) 24 Cal.4th 889, 897 [103 Cal.Rptr.2d 23, 15 P.3d 243].) "Traditionally, there has been 'an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant [and] which was subject to cross-examination . . . .' (*Barber v. Page* [(1968) 390 U.S. 719,] 722 [20 L.Ed.2d 255, 88 S.Ct. 1318].)" (*Cromer, supra*, 24 Cal.4th at p. 897.) "Pursuant to this exception, the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's constitutional right. [Citation.]" (*People v. Herrera* (2010) 49 Cal.4th 613, 621 [110 Cal.Rptr.3d 729, 232 P.3d 710].)

 Evidence Code section 1291, subdivision (a), provides: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." A witness is considered " 'unavailable' " if "[a]bsent from the

hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (*Id.*, § 240, subd. (a)(5).) Factors that a court should consider in determining whether reasonable diligence has been shown include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored. (*People v. Cromer, supra*, 24 Cal.4th at p. 904.)

Defendant concedes, as he must, that reasonable efforts were made to secure Jones's presence at trial. Indeed, this court has held that less substantial efforts, conducted closer to trial and for shorter periods of time, were sufficient to enable a court to deem a witness "unavailable" and admit the witness's prior recorded testimony. (*People v. Hovey* (1988) 44 Cal.3d 543, 562–563 [244 Cal.Rptr. 121, 749 P.2d 776] [reasonable diligence had been exercised when, for more than a month, investigators had telephoned the witness, checked his arrest and driver's license records, consulted police and FBI reports, and attempted to locate the witness's parents and in-laws]; *People v. Wilson* (2005) 36 Cal.4th 309, 341–342 [30 Cal.Rptr.3d 513, 114 P.3d 758] [two-day effort to locate a witness was sufficient and the prosecution was not obligated to try to locate the witness's family].)

Defendant relies upon the decision in *People v. Louis* (1986) 42 Cal.3d 969 [232 Cal.Rptr. 110, 728 P.2d 180] to argue that while the prosecution made a "reasonable effort" to find Jones, it "did not exercise due diligence in *preventing* Jones from becoming absent in the first place." Specifically, defendant faults the prosecution for ignoring warning signs indicating that Jones might not appear at trial, and for failing to take Jones into custody to secure his attendance.

The circumstances in *Louis* were unusual. The defendant and four codefendants were charged with murder, robbery and related charges. His codefendants were soon apprehended and trial against them was set for February 1981, but the defendant was not arrested until several months later. The defendant's preliminary hearing was held just prior to the trial of his codefendants, and Gregory Tolbert testified that he overheard the defendant discuss the robbery and admit the murder. (*People v. Louis, supra*, 42 Cal.3d at pp. 976–977.) At the time he testified, Tolbert was "in custody on a theft-related felony." (*Id.* at p. 977.) He "admitted that he had used many aliases, that he had been in custody several times since August 1980, and that on three occasions after he was released he left town, failed to make required court appearances, and had to be arrested on bench warrants in order to be brought to court." (*Ibid.*) The prosecution also was aware that Tolbert had several felony convictions, had been committed to a hospital for the criminally insane, and apparently believed he stood to reap a reward if the defendant was convicted as a result of his testimony. (*Id.* at p. 989.)

At the trial against the defendant's codefendants, Tolbert, who was still in custody "on one theft-related felony and awaiting sentencing on another," refused to testify unless he would then be "released on his own recognizance to spend the weekend between the end of his testimony and his scheduled sentencing hearing with an unnamed friend at an undisclosed address." (*People v. Louis, supra,* 42 Cal.3d at p. 990.) The prosecutor agreed. (*Ibid.*) After he testified, Tolbert was released and "promptly disappeared." (*Id.* at p. 978.) The prosecutor later acknowledged that, although he believed Tolbert would appear for his sentencing hearing, " 'there was a very real possibility that the man would boogie, that he wouldn't show up.' " (*Id.* at p. 992.)

At the defendant's trial, the court found that Tolbert was unavailable as a witness and admitted into evidence his testimony at the preliminary hearing. (*People v. Louis, supra,* 42 Cal.3d at p. 978.) We reversed the resulting conviction, holding that the trial court erred in finding that the prosecutor had exercised reasonable diligence to procure Tolbert's presence, because the prosecution had failed to use reasonable means to prevent Tolbert from becoming absent. (*Id.* at p. 991.)

This court noted that "the diligence required of the prosecution to prevent Tolbert from becoming absent was particularly high" because "Tolbert was a critical prosecution witness, and was known to be both unreliable and of suspect credibility—the very type of witness that requires, but is likely not to appear to submit to, cross-examination before a jury." (*People v. Louis, supra,* 42 Cal.3d at p. 991.) The prosecution, however, had "failed to exercise virtually any effort to prevent Tolbert from becoming absent." (*Ibid.*) The prosecution's "single purpose" was to secure Tolbert's testimony at the first trial of the codefendants. (*Ibid.*)

But it was more than the prosecution's failure to prevent Tolbert's absence at the defendant's trial that led this court to reverse the defendant's conviction. The opinion in *Louis* concluded that the prosecution's efforts to procure Tolbert's testimony at the first trial of the codefendants "were not unlikely to lead to Tolbert's absence from his scheduled sentencing hearing and subsequently from any future trial in this matter." (*People v. Louis, supra,* 42 Cal.3d at p. 992.) The opinion in *Louis* goes so far as to suggest "something other than mere indifference" on the part of the prosecution, stating that the prosecutor "may have taken no steps to prevent Tolbert's disappearance after the first trial because he had the testimony from defendant's preliminary hearing which could be used if Tolbert became unavailable. Indeed, the prosecutor may have taken no steps *because he hoped that Tolbert would disappear,* since as the court recognized '[Tolbert] would not look as good in person as he does in reading out of the transcript . . . .' " (*Id.* at p. 993, fn. 7, italics added.)

Subsequent cases have limited the holding in *Louis* to its peculiar facts. The defendant in *People v. Bunyard* (2009) 45 Cal.4th 836 [89 Cal.Rptr.3d 264, 200 P.3d 879] hired someone to kill his pregnant wife. Randy Johnson testified that earlier the defendant repeatedly had asked him to kill the victim, but he had refused. This court affirmed the defendant's conviction of first degree murder and upheld the special circumstance finding, but reversed the judgment of death. Approximately one month before the penalty phase retrial, a bench warrant was issued for Johnson when he failed to respond to the prosecution's subpoena.

Johnson was arrested on the warrant after the penalty phase retrial had commenced, and appeared for a hearing. The prosecutor informed the court that, other than the bench warrant, there was no reason to hold Johnson in custody. A sheriff's officer, Sergeant Johnsen, assured the court that he could contact Johnson when needed and the court released Johnson on his own recognizance, requiring him to call Sergeant Johnsen each week and ordering him to return to court the following month. Johnson returned to court as ordered the following month, and appeared on two subsequent occasions as ordered, but then disappeared. The trial court ruled that Johnson was unavailable as a witness and admitted into evidence his testimony at the first trial.

We affirmed the resulting judgment of death, rejecting the defendant's argument that the trial court erred in releasing Johnson on his own recognizance and holding that "the trial court made a reasonable determination that Randy Johnson would appear to testify, and the prosecution's support for the trial court's decision did not constitute a lack of reasonable diligence." (*People v. Bunyard, supra*, 45 Cal.4th at p. 851.) The opinion in *Bunyard* acknowledged that "the decision to keep a material witness in custody involves balancing the [defendant's] right [to confront witnesses] against the substantial due process right of the witness, who had not been charged with a crime, to not be unreasonably incarcerated." (*Ibid.*)

We distinguished the decision in *Louis*, noting that "Johnson, unlike Tolbert, had no current charges pending against him . . . and therefore did not represent an imminent flight risk" and that "Johnson's release on his own recognizance was not undertaken in subordination to some other prosecutorial objective, but was an attempt to balance Johnson's liberty interests with defendant's right to confrontation." (*People v. Bunyard, supra*, 45 Cal.4th at p. 853.) We also compared Tolbert's "relatively minor" liberty interest in being released for a weekend prior to being sentenced to Johnson's "considerably greater" liberty interest in not being incarcerated for several weeks awaiting trial when he had no criminal charges pending and was not an

imminent flight risk. (*Ibid.*; see also *People v. Hovey, supra*, 44 Cal.3d at p. 564 ["due process principles obviously would not have permitted holding Lee as a material witness during the two-and-one-half-year period that elapsed following his preliminary examination testimony"]; *People v. Wise* (1994) 25 Cal.App.4th 339, 344 [30 Cal.Rptr.2d 413] [distinguishing *Louis* on the basis that "the witness was a citizen-victim. He was not facing criminal charges and the record does not indicate any reason for the prosecution to believe he would disappear."].)

While we "defer to the trial court's determination of the historical facts of what the prosecution did to locate an absent witness," we "independently review whether those efforts amount to reasonable diligence sufficient to sustain a finding of unavailability." (*People v. Bunyard, supra*, 45 Cal.4th at p. 851.) We agree with the trial court that the prosecution demonstrated reasonable diligence in attempting to secure Jones's presence to testify. Unlike in *Louis*, Jones's testimony was not "vital" to the prosecution's case; the jury already had learned that defendant had been convicted of voluntary manslaughter and Jones's testimony was needed only to explain the circumstances of that crime. Nor was Jones's credibility as suspect as the credibility of the witness in *Louis*. (See *People v. Louis, supra*, 42 Cal.3d at p. 991.) Most important, unlike in *Louis*, Jones was neither charged with nor convicted of a crime and was not an imminent flight risk. He admittedly was unreliable, because he was an alcoholic and a drug addict, and the prosecutor remarked when Jones could not be located that he "always had my doubts as to whether or not he would appear," but this was not sufficient to require that Jones be placed in custody to ensure his presence at trial. The risk that a witness might not appear must be weighed against the witness's substantial due process right not to be unreasonably incarcerated.

Defendant argues that even if Jones was unavailable, the trial court violated his right to confront the witnesses against him by admitting Jones's testimony, because a preliminary hearing held 15 years earlier in a different criminal proceeding did not constitute "a prior opportunity for cross-examination." Defendant acknowledges that we held to the contrary in *People v. Wharton* (1991) 53 Cal.3d 522 [280 Cal.Rptr. 631, 809 P.2d 290], in which we upheld the introduction of the transcript of a preliminary hearing in a prior conviction conducted 11 years prior to the trial of the charged offense. Defendant presents no persuasive reason for us to reconsider our decision in *Wharton*.

### 6. Evidence of Unadjudicated Criminal Activity

#### i. Validity of Section 190.3, Factor (b)

Defendant contends the trial court erred by admitting into evidence four instances of unadjudicated criminal activity in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

 Section 190.3, factor (b), provides that in determining the penalty for first degree murder with special circumstances the trier of fact may consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Defendant asserts that section 190.3 is unconstitutionally vague, lowers rather than heightens the reliability requirements, and deprived him of his rights to due process of law, equal protection, a reliable penalty determination, the presumption of innocence, and a unanimous verdict. We previously have considered and rejected these claims and defendant presents no persuasive reason for us to reconsider these holdings. (*People v. Lomax* (2010) 49 Cal.4th 530, 591 [112 Cal.Rptr.3d 96, 234 P.3d 377]; *People v. Taylor, supra,* 48 Cal.4th 574, 651–652; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1061 [90 Cal.Rptr.2d 607, 988 P.2d 531]; *People v. Cain, supra,* 10 Cal.4th 1, 69–70.) We also have previously considered and rejected defendant's arguments that having the same jury that found defendant guilty of the charged offenses consider the unadjudicated criminal activity during the penalty phase deprived him of an impartial jury (*People v. Hillhouse* (2002) 27 Cal.4th 469, 507 [117 Cal.Rptr.2d 45, 40 P.3d 754]), and that the expiration of the statute of limitations bars the use of unadjudicated criminal activity as an aggravating factor (*People v. Hartsch* (2010) 49 Cal.4th 472, 515 [110 Cal.Rptr.3d 673, 232 P.3d 663]).

#### ii. Admissibility of Evidence

Defendant argues that evidence that defendant either kissed or pinched Kelly Minix on the neck, leaving a mark, should not have been admitted, because "it is not the sort of violent criminal activity that authorizes or warrants the death penalty." As noted above, Kelly Minix testified that defendant followed her to her automobile as she was leaving work, leaned into the vehicle and sucked on her neck, leaving a bruise. Defendant concedes that "this was a battery and thus involved the use of 'force' in a strict legal sense." The evidence thus was admissible under section 190.3, factor (b) as "criminal activity by the defendant which involved the use or attempted use of force or violence." Although this conduct, by itself, would not warrant choosing to impose the death penalty over life imprisonment

without parole, the jury was entitled to consider the fact that defendant attacked a coworker in determining the appropriate penalty.

Defendant contends that the trial court erred in admitting testimony from defendant's former wife that defendant had been " 'fooling around' with a neighbor's daughter and with her sister" and had called her son names. In describing an incident that began as an argument between her son, Laron, and her daughters over the use of a VCR, but culminated in defendant striking her, Delores Thomas testified: "And we was like arguing, and I had started saying all the things that was on my mind that's been on my mind that I accused him of fooling around with a neighbor's daughter. I accused him of fooling around with my sister, and then when I said the part about my sister he—." Defendant objected, but the prosecutor explained that he was "not offering it for the truth of what she's saying, just to describe the circumstances of what happened." The court ruled: "With that understanding, the objection will be overruled." Delores Thomas then testified that the argument culminated with defendant punching her in the nose.

On cross-examination, defense counsel asked if defendant seemed to be irritated by the children arguing over the VCR and Delores Thomas replied that defendant was irritated with her son, Laron. On redirect examination, the prosecutor asked Delores Thomas whether defendant had a good relationship with her son, and she answered he did not and would call her son names like "punk" and "sissy." The trial court overruled defendant's objection.

" '[W]hen the prosecution has evidence of conduct by the defendant that [is admissible under section 190.3, factor (b)], evidence of the surrounding circumstances is admissible to give context to the episode, even though the surrounding circumstances include other criminal activity that would not be admissible by itself. [Citation.]' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1081 [81 Cal.Rptr.3d 651, 189 P.3d 911]; see *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1013–1014 [30 Cal.Rptr.2d 818, 874 P.2d 248].) The trial court did not err.

### 7. *Instruction on Inapplicable Mitigating Factors*

Defendant contends the trial court deprived him of due process and a reliable penalty determination by instructing the jury pursuant to CALJIC No. 8.85 on all aggravating and mitigating factors, including four mitigating factors that were not supported by the evidence. Defendant acknowledges that we upheld this practice in *People v. Ghent, supra,* 43 Cal.3d 739, 776–777, because "the jury is capable of deciding for itself which factors are 'applicable' in a particular case." (*Id.* at p. 777.) We have often reaffirmed this holding (see, e.g., *People v. Harris* (2008) 43 Cal.4th 1269, 1320–1321 [78

Cal.Rptr.3d 295, 185 P.3d 727]) and defendant presents no persuasive reason for us to conclude otherwise.

### 8. *Validity of Death Penalty Statutes*

Defendant raises a number of challenges to the validity of the death penalty statutes that we previously have considered and rejected. Thus, we again conclude as follows.

Section 190.2 adequately narrows the class of offenders eligible for the death penalty. (*People v. Cowan* (2010) 50 Cal.4th 401, 508 [113 Cal.Rptr.3d 850, 236 P.3d 1074].) "Section 190.3, factor (a), which allows the jury to consider the 'circumstances of the crime' in determining whether to impose the death penalty, is not unconstitutionally vague, arbitrary or capricious." (*Ibid.*) The absence of certain procedural protections, such as a burden of proof, written findings, jury unanimity and disparate sentence review, does not violate the federal Constitution. (*Id.* at pp. 508–509.)

" ' "The Eighth and Fourteenth Amendments do not require that a jury unanimously find the existence of aggravating factors or that it make written findings regarding aggravating factors." [Citations.] "[N]either the cruel and unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth Amendment, requires a jury to find beyond a reasonable doubt that aggravating circumstances exist or that aggravating circumstances outweigh mitigating circumstances or that death is the appropriate penalty. [Citations.]" ' [Citation.] Moreover, the statute ' "is not unconstitutional because it does not contain a requirement that the jury be given burden of proof or standard of proof instructions for finding aggravating and mitigating circumstances in reaching a penalty determination." ' [Citation.]" (*People v. Cowan, supra*, 50 Cal.4th at pp. 508–509.) "Nothing in the United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (e.g., *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]) compels a different answer to these questions." (*Cowan*, at p. 509.)

"The failure to require intercase proportionality review does not violate due process, equal protection or the Eighth Amendment. [Citations.]" (*People v. Cowan, supra*, 50 Cal.4th at p. 509.) The use of adjectives such as "extreme" and "substantial" does not prevent the jury from considering relevant mitigating evidence. (*Ibid.*) "The jury need not be instructed that section 190.3, factors (d), (e), (f), (g), (h) and (j) are relevant only as possible mitigators. (*People v. Leonard* [(2007)] 40 Cal.4th [1370,] 1430 [58 Cal.Rptr.3d 368,

157 P.3d 973].) Nor is the trial court required to instruct that the absence of a particular mitigating factor is not aggravating. (*People v. Rogers* [(2006)] 39 Cal.4th [826,] 897 [48 Cal.Rptr.3d 1, 141 P.3d 135].) In any event, the jury here was instructed that '[t]he absence of mitigation does not amount to the presence of aggravation.' " (*Id.* at p. 509.)

"The availability of certain procedural protections in noncapital sentencing—such as a burden of proof, written findings, jury unanimity and disparate sentence review—when those same protections are unavailable in capital sentencing, does not signify that California's death penalty statute violates Fourteenth Amendment equal protection principles. [Citations.]" (*People v. Cowan, supra,* 50 Cal.4th at p. 510.)

"The death penalty, when applied in accord with state and federal statutory and constitutional requirements, does not violate international law. [Citation.] International norms of human decency do not render the death penalty, applied as a regular form of punishment, violative of the Eighth Amendment. [Citations.]" (*People v. Cowan, supra,* 50 Cal.4th at p. 510.)

### 9. *Victim Impact Testimony*

Defendant contends the trial court deprived him of his rights to due process and a reliable penalty determination under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution by admitting victim impact testimony.

Darcie Purcell testified she had been a classmate and close friend of the victim and described how loving the victim's family had been. She often spent the night at the victim's house and felt like part of the family. The victim was friendly, outgoing, and hard working. She held two jobs to help support her family, in addition to attending school. She was the quarterback of the "Powder Puff" football team they both were on, and the victim helped run a peer counseling program at school.

Purcell described her reaction when she was told that the victim was dead. She cried and was unable to eat or go to school. She stayed with the victim's family and helped pick out a coffin. She testified: "All of us were just kind of in a daze." The victim's death affected everyone in her high school graduating class. The high school erected a memorial to the victim.

Defendant argues that victim impact testimony does not properly include the testimony of a nonfamily member who was not present when the victim was killed. "As we have previously observed, victim impact evidence is not limited to the effect of the victim's death on family members [citation],

but may include its effects on the victim's friends, coworkers, and the community . . . ." (*People v. Ervine* (2009) 47 Cal.4th 745, 792–793 [102 Cal.Rptr.3d 786, 220 P.3d 820].)

Defendant next contends that victim impact testimony may not include personal characteristics of the victim that were unknown to the defendant. "Defendant is mistaken. We have approved victim impact testimony from multiple witnesses who were not present at the murder scene and who described circumstances and victim characteristics unknown to the defendant. [Citation.]" (*People v. Pollock* (2004) 32 Cal.4th 1153, 1183 [13 Cal.Rptr.3d 34, 89 P.3d 353].)

Defendant also asserts that permitting victim impact testimony as "circumstances of the crime" under section 190.3, factor (a) raises "concerns about vagueness and the arbitrary application of Penal Code section 190.3." We previously have rejected this contention as well. (*People v. Ervine, supra*, 47 Cal.4th at p. 793.)

### 10. *Cruel and Unusual Punishment*

Defendant contends the death penalty constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution. We repeatedly have rejected this contention. (See, e.g., *People v. Jennings* (2010) 50 Cal.4th 616, 687 [114 Cal.Rptr.3d 133, 237 P.3d 474].)

### 11. *Cumulative Error*

Defendant argues he was deprived of his rights to due process, a fair trial, and a reliable penalty trial under the Eighth and Fourteenth Amendments to the federal Constitution by the cumulative effect of the errors he claims.

We conclude above that the cumulative effect of the two errors that occurred during the guilt phase—the trial court erred in instructing the jury pursuant to the 1996 version of CALJIC No. 2.28 (see *ante*, at pp. 483–484) and it was improper for the prosecutor to argue to the jury that defendant could be released on parole if it did not find the special circumstances allegation true (see *ante*, at p. 486)—did not require reversal of the judgment (see *ante*, at p. 489). As to the penalty phase, we held that reversal of the judgment would not be required even were we to conclude that defendant's admission to Sergeant Franks that he assaulted McCowan should not have been admitted into evidence, because such error would be harmless beyond a reasonable doubt. (See *ante*, at p. 498.) The cumulative effect of any such error, when considered together with the two harmless errors identified in the guilt phase, did not prejudice defendant and does not justify reversal of the judgment.

## III. Disposition

The judgment is affirmed in its entirety.

Kennard, Acting C. J., Baxter, J., Werdegar, J., Chin, J., Corrigan, J., and George, J.,* concurred.

---

*Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.