Filed 12/4/15  P. v. Lopez and Stopani CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B259051 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA124204) |
| v. | |
| EUDIEL EDDIE LOPEZ and DANIEL CESAR STOPANI, | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court for Los Angeles County, John A. Torribio, Judge.  Judgment against Lopez affirmed as modified; judgment against Stopani affirmed as modified and remanded for determination of presentence custody credit.

J. Kahn, under appointment by the Court of Appeal, for Defendant and Appellant Eudiel Eddie Lopez.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Cesar Stopani.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant Eudiel Eddie Lopez guilty of first degree murder (Pen. Code,[1] § 187, subd. (a)), found defendant Daniel Cesar Stopani guilty of second degree murder (§§ 187, 189), and found gun (§ 12022.53, subds. (b)-(d)) and gang (§ 186.22, subd. (b)(4)) allegations to be true as to both defendants. The trial court sentenced Lopez to 50 years to life in prison (25 years to life for first degree murder, plus a consecutive term of 25 years to life for the gun allegation), and sentenced Stopani to 40 years to life in prison (15 years to life for second degree murder, plus a consecutive term of 25 years to life for the gun allegation). The trial court also imposed, and stayed, a 10-year gang enhancement on Lopez and a 25-year gang enhancement on Stopani.[2]

Each defendant appeals from the judgment against him. Lopez contends the judgment against him must be reversed because it was premised on his confession, which he argues was obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Both defendants also contend that the trial court erred when it imposed, and stayed, gang enhancements under section 186.22, subdivision (b).[3] The Attorney General concedes the latter contention, and argues that, under *People v. Lopez* (2005) 34 Cal.4th 1002 and *People v. Brookfield* (2009) 47 Cal.4th 583, we must strike the gang enhancement as to both defendants, and modify the judgment against Lopez to impose a 15-year minimum parole eligibility term under

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    Although the minute order from the sentencing hearing states that the trial court imposed and stayed a 10-year gang enhancement on Stopani, the reporter's transcript shows that the court imposed and stayed a 25-year gang enhancement on him.

[3]    Stopani also contends the minute order reflecting the judgment should be corrected to show the 25-year gang enhancement the trial court actually imposed and stayed. That contention is moot in light of our conclusion that the trial court erred by imposing *any* gang enhancement.

section 186.22, subdivision (b)(5). The Attorney General also argues that the trial court erred in calculating the actual custody credit due to Stopani, and asks us to remand the matter to the trial court to determine the proper custody credit. We conclude there was no violation of *Miranda*, but agree that the trial court erred by imposing the gang enhancement and miscalculated the custody credit due Stopani. Accordingly, we strike the gang enhancements imposed as to both defendants and affirm the judgment as modified, but remand the matter to the trial court to recalculate the actual custody credit due Stopani.

## BACKGROUND

At around noon on March 16, 2012, Michael Soto was selling marijuana in the parking lot of a strip mall located at the intersection of Painter Avenue and Mulberry Drive in Whittier. He was sitting on a low wall facing a liquor store.

Shortly before noon, a security guard for the high school across the street from the liquor store saw four men walking quickly up Painter, towards Mulberry. He identified one of the men as Stopani, who was walking with a tall man; one of the other men, who was behind Stopani and the tall man, was on a skateboard or scooter. The guard lost sight of the men after they crossed the street and walked toward the liquor store, because a bus came up the street and blocked his view. Shortly thereafter he heard three gunshots.

Walter Orellana, who was standing a few feet from Soto, saw Stopani cross the street toward the parking lot and saw Lopez approach from the train tracks north of the parking lot. Stopani approached Soto from the front, said "Whittier Trece," and punched Soto in the face. Almost immediately, Lopez, who had approached Soto from the back, pulled a silver revolver from his waistband and shot Soto in the head, then shot him twice more in the back as Soto was falling

3

down.[4]  After shooting Soto, Lopez ran toward the railroad tracks, and Stopani ran with another man toward a doughnut shop.

Emerson Vado, who was in the office of his shop across the street from the shooting, ran outside after hearing the shots.  He saw a man put an object in his waistband and take off on a skateboard toward the train tracks.  The man fell off the skateboard by the tracks and ran away, leaving the skateboard behind.

Jose Salmeron, who was in his car on Mulberry and heard the shooting, saw two men running south on Painter.  He followed them in his car and called 911.  While he was talking with dispatch, he saw the two men go into a Del Taco.

Detective Ricardo Lavan of the Los Angeles Sheriff's Department was on patrol duty and was responding to the shooting location.  As he was driving north, he saw Jose Salmeron pointing to two men walking southbound, one of whom was Stopani.  The Detective detained both men.

Deputy David Vivona of the Los Angeles Sheriff's Department responded to the railroad tracks north of the scene of the shooting.  He was on his motorcycle, and was looking for a suspect who was last seen heading north.  He found a skateboard by the railroad crossing arm.  He also saw some muddy footprints along the train tracks.  He followed them until they disappeared at a fence or walled off area of a trailer park.

Deputy Joseph Garrido participated in the search for the suspect in the trailer park.  He went to one of the trailers and spoke to a woman at the door.  He saw a young man standing off to the side, who appeared startled by his presence, and an

---

**4**    At trial, Orellana identified Stopani as the shooter and Lopez as the puncher.  However, he testified that he identified the shooter from a photo array five hours after the shooting.  The photo he chose was of Lopez.  In addition, he testified that the person who punched Soto had a pierced lip; Lopez did not have a pierced lip at the time of the shooting, but Stopani did.

older man; the young man, Rafael Vargas, was the son of the woman and older man. Deputy Garrido asked the woman if there was anyone else in the house. She said that her son's friend might be in her son's bedroom. Deputy Garrido went into the bedroom, and found Lopez sitting on the bed.

Detective Sergeant John O'Brien, a detective assigned to the homicide bureau of the Los Angeles Sheriff's Department, later searched the bedroom with his partner, Detective Mark Lillienfield, and two gang detectives. They found a pair of muddy sneakers in the closet; the mud appeared to be fresh. They also found a stainless steel .357 revolver and a glove underneath the dresser. There was a plastic bag inside the glove that contained live ammunition. Detective Sergeant O'Brien opened the cylinder of the revolver and found it had four expended cases and two live rounds.

Rafael Vargas and Lopez were separately transported to the sheriff's station. The deputy who transported Lopez conducted a gunshot residue test on him. By the time of the test, he had been detained for approximately four and a half hours, two hours of which he was in the backseat of the deputy's patrol car.

At the sheriff's station, Vargas and Lopez were separately interviewed by Detective Sergeant O'Brien and Detective Lillienfield. Both interviews were surreptitiously recorded.

During the interview of Vargas, Vargas initially said that Lopez came to his house at around 10:00 a.m. and knocked on his front door. Lopez looked sleepy, so Vargas invited him to come in and sleep in Vargas' bedroom while Vargas played video games in the living room. The detectives pressed Vargas to tell the truth, and Vargas asked if what he said would be anonymous. After the detectives told him they would protect him, Vargas said that when Lopez came to his house his was out of breath, and said, "I think I shot him." He told Vargas that he saw the guy fall and shot him two more times. Lopez did not tell Vargas who it was

5

that he shot, but he told Vargas that he shot him because Lopez "banged on him," and the guy said "I don't give a fuck."

The detectives interviewed Lopez the day after the shooting. After obtaining various identification information from Lopez (such as his birthdate, address, mother's name, etc.), the following exchange took place between Detective Sergeant O'Brien and Lopez:

"O'BRIEN: Okay. Um, well, we wanted to let you, um, calm down a little bit before we talk to you. Because I know last night was probably, uh, a long night for you, so we didn't want anybody to pull you out in the middle of the night when you were tired.

"LOPEZ: Yeah.

"O'BRIEN: So, um, I appreciate you coming in here and talking to us. I think you know you don't have to talk to us. But what we're trying [to] do is find out the truth of what happened yesterday. OK?

"LOPEZ: Yeah.

"O'BRIEN: Um, basically that's exactly what we're here to do. We're here to find the truth, okay, and everything you tell us we're gonna write down. We're not gonna change it. We're not gonna manipulate it. What you tell us is the truth; we're gonna put on paper. And that's if this ever goes to court, that's what will go to court. And if they need to use that they'll use it for you or against you. Okay.

"LOPEZ: Yeah.

"O'BRIEN: Um, and since you are in here you do have a right to an attorney, you know that. And if you couldn't afford one, I don't know what you[r] circumstances are with your mom, but if you guy's [*sic*] couldn't afford one we would provide one for you free of charge, okay. Um, and you understand that; right?

"LOPEZ: Yeah."

Detective Sergeant O'Brien then told Lopez that he and his partner had talked to a lot of people, and that there was not much doubt about what happened, but they just wanted to get his side of the story. At first, Lopez told the detectives that he had slept at Vargas' house the night before the shooting and did not wake up until the deputies came into the house. As Detective Sergeant O'Brien went through the evidence they had found pointing to Lopez as the shooter, Lopez continued to deny any involvement and asked the detective what he wanted Lopez to tell him. The detective explained to Lopez that he was facing the death penalty unless he could explain why things happened the way they did. Lopez, who was surprised that he could be facing the death penalty, said, "Because he was my enemy." Lopez admitted that he was from Whittier Trece, and the victim was from another gang. He told the detective that Vargas had nothing to do with the shooting. He explained that he (Lopez) had a confrontation with the victim about a month earlier, during which Lopez told the victim what gang he belonged to and asked the victim where he was from, and the victim told Lopez he did not care. As the detective began asking questions about the shooting, Lopez said that he wanted to talk to a lawyer and said he did not want to talk to the detectives about it. Although the detectives continued to question him, Lopez refused to discuss the shooting with them.

Lopez and Stopani were charged with one count of murder (§ 187, subd. (a)), with gun and gang allegations (§§ 12022.53, subds. (b)-(d), 186.22, subd. (b)(1)(C)). At trial, the prosecution's evidence included testimony from the percipient witnesses and the peace officers involved in the search for and detention of the defendants and the investigation of the shooting, as well as testimony from the deputy medical examiner who conducted the autopsy on Soto, two chemists and a criminalist from the Sheriff's Department crime lab, a sheriff's deputy at the

7

correctional facility where Stopani was housed, and a gang detective who testified as a gang expert.

The coroner testified that Soto's death was caused by a gunshot wound of the chest. One of the chemists testified that he analyzed the revolver, expended cases, and live rounds found in Vargas' bedroom, as well as the bullets recovered from Soto's body, and determined that two of the recovered bullets were fired from the revolver. The other chemist testified that he processed the gunshot residue kit from the test conducted on Lopez, and found one particle that, in his opinion, was gunshot residue, which could have been there because Lopez fired a gun, handled a gun, been next to someone who fired a gun, or touched a surface that had gunshot residue on it.

The criminalist, a DNA analyst, testified that he analyzed samples taken from the inside of a shoe found in Vargas' closet, and from the revolver, and compared those with oral reference samples from Lopez, Stopani, and Soto. He found a partial DNA profile from the inside of the shoe sample that was a mixture of at least three individuals, but he could not make any conclusions because there was such a limited amount of data from the shoe. With regard to the revolver, he found a DNA profile from both the grip, trigger, and hammer sample, and from the barrel, cylinder, and remaining surfaces sample. The profile from each sample was consistent with a mixture of at least three individuals, and there was a distinct group of alleles that was consistent with one contributor. With regard to both samples, Lopez was included as a possible contributor, and Stopani and Soto were excluded.

The deputy at the correctional facility testified about items found in Stopani's property bag, and the gang detective testified that some of the writing on those items was related to the Whittier Trece gang and the defendants. The gang detective also testified that both defendants were members of the Whittier Trece

8

gang and, presented with a hypothetical based upon the facts of this case, opined that the shooting was done for the benefit of the gang.

In addition to the testimony, the prosecution presented surveillance videos from a bus that was stopped stop across the street from the shooting and from a nearby store. Those videos, which were played for the jury, showed Stopani walking north toward the victim and Lopez approaching the victim from behind on a skateboard to shoot him, and then after the shooting, Stopani walking away while taking his shirt off. Finally, the prosecution played for the jury the recordings from the interviews of Vargas and Lopez, and provided transcripts of those recordings.[5]

## DISCUSSION

A. *Miranda Issue*

Lopez contends the detectives who questioned him failed to warn him of his right to remain silent, as required by *Miranda*, *supra*, 384 U.S. 436, and therefore the trial court's denial of his motion to exclude the statements he made to the detectives was erroneous and mandated reversal of the judgment against him. We conclude that *Miranda* was not violated, and even if it had been, any error was harmless.

In *Miranda*, the United States Supreme Court established that before commencing custodial interrogations, police must advise criminal suspects of their rights under the Fifth and Fourteenth Amendments, i.e., that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

---

[5] Lopez moved to exclude all evidence of his post-arrest statements to the detectives on the ground they were obtained in violation of *Miranda*, *supra*, 384 U.S. 436. The trial court denied the motion, and allowed the recording (up to the time that Lopez requested an attorney and said he did not want to talk about the shooting) to be played for the jury.

(*Miranda*, *supra*, 384 U.S. at p. 479.)  The Court in *Miranda* did not require that the advisement be given in the exact form set out in the decision.  (See *id*. at p. 476 ["The warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent*, prerequisites to the admissibility of any statement made by a defendant," italics added].)  Indeed, in several subsequent decisions, the Supreme Court made clear that "the 'rigidity' of *Miranda* [does not] extend[] to the precise formulation of the warnings given a criminal defendant," and that "no talismanic incantation [is] required to satisfy its strictures."  (*California v. Prysock* (1981) 453 U.S. 355, 359; see also *Florida v. Powell* (2010) 559 U.S. 50, 60; *Duckworth v. Eagan* (1989) 492 U.S. 195, 202-203; *Rhode Island v. Innis* (1980) 446 U.S. 291, 297.)  In reviewing whether adequate warnings were given, a reviewing court must determine "'whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*."'"  (*Florida v. Powell*, *supra*, 559 U.S. at p. 60; see also *People v. Wash* (1993) 6 Cal.4th 215, 236-237.)

In his appellant's opening brief, Lopez asserts that he "was not advised of his right to remain silent and refuse to speak with police.  After asking general questions, the interviewing officer, Sergeant O'Brien, told [Lopez], 'We're here to find the truth, okay, and everything you tell us we're gonna [write] down. . . .  And that's if this ever goes to court, that's what will go to court.  And if they need to use that they'[ll] use it for you[] or against you."  Lopez's brief then goes on to quote Detective Sergeant O'Brien's warning regarding Lopez's right to an attorney.

If those were the only warnings given to Lopez, we might agree that he was not warned of his right to remain silent.  But Lopez overlooks the first warning that Detective Sergeant O'Brien gave.  Immediately before the warning that Lopez quotes in his brief, Detective Sergeant O'Brien told Lopez, "I think you know you

don't have to talk to us. But what we're trying [to] do is find out the truth of what happened yesterday. OK?" And Lopez said, "Yeah." We find this was sufficient to convey to Lopez that he had a right to remain silent. Our finding is supported by the record, which establishes that Lopez understood his right to remain silent, inasmuch as he invoked that right later in the interview and refused to answer any questions about the circumstances of the shooting. Thus, we conclude there was no violation of *Miranda*.

Even if we had found that Detective Sergeant O'Brien's warning was insufficient under *Miranda*, we would find that any error in admitting Lopez's statements to the detectives was harmless beyond a reasonable doubt because the evidence establishing that Lopez shot Soto was overwhelming. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 288, 310; *People v. Thomas* (2011) 51 Cal.4th 449, 498.) Orellana, who was standing just a few feet from Soto when he was shot identified Lopez as the shooter a few hours after the shooting took place. Lopez was seen by at least two witnesses fleeing the scene on his skateboard, heading toward the train tracks. One of those witnesses saw him fall off his skateboard and run away, leaving the skateboard behind. A deputy found the abandoned skateboard and followed Lopez's muddy footprints to a trailer park, where Lopez was found in a trailer where his friend, Vargas, lived. Lopez's muddy sneakers were found in the closet of the bedroom where he was found, and the gun that was used to shoot Soto was found in that bedroom. The gun had DNA on it that was consistent with Lopez's DNA, and Lopez had gunshot residue on his hands. Finally, Vargas told the detectives that when Lopez came to his home, he told Vargas that he had just shot someone because when Lopez "banged on him," the victim had disrespected him.

Given this overwhelming evidence of Lopez's guilt, we conclude beyond a reasonable doubt that the result of the trial would not have been different even if

11

Lopez's statements, which were cumulative of other evidence, had not been admitted.

B.    *Gang Enhancements*

Both defendants contend the trial court erred by imposing and staying an additional 10 or 25-year prison term for the gang enhancement under section 186.22, subdivision (b).  The Attorney General concedes the error.  We agree.

Under *People v. Lopez*, *supra*, 34 Cal.4th 1002, a defendant who is convicted of first degree murder committed for the benefit of a criminal street gang is not subject to the 10-year prison term enhancement under section 186.22, subdivision (b)(1)(C), but instead must receive a 15-year minimum parole eligibility term under section 186.22, subdivision (b)(5).  (*Id.* at pp. 1004-1011.)  Therefore, the judgment against Lopez must be modified to delete the 10-year gang enhancement imposed under section 186.22, subdivision (b)(1)(C), and to reflect the imposition of a 15-year minimum parole eligibility enhancement under section 186.22, subdivision (b)(5).

Under *People v. Brookfield*, *supra*, 47 Cal.4th 583, when a defendant is convicted of a gang-related crime, and a principal in the offense discharges a firearm but the defendant did not, the trial court may not impose both a gang enhancement and a firearm enhancement.  (*Id.* at p. 586.)  Therefore, the judgment against Stopani must be modified to delete the gang enhancement imposed under section 186.22, subdivision (b).

C.    *Stopani's Custody Credit*

As the Attorney General noted in its respondent's brief, the trial court clearly erred in awarding Stopani 938 days of actual custody credit, because that number of days exceeds the number of days between the date of the offense and the date of

12

sentencing. The record is ambiguous regarding when Stopani was incarcerated in relation to this case, and therefore we must remand the matter with directions to the trial court to determine the proper number of days of presentence custody credit to which Stopani is entitled.

## DISPOSITION

The judgment against Lopez is modified to delete the 10-year gang enhancement imposed under section 186.22, subdivision (b)(1)(C), and to reflect the imposition of a 15-year minimum parole eligibility enhancement under section 186.22, subdivision (b)(5). The judgment against Stopani is modified to delete the gang enhancement. As modified, the judgments are affirmed, and the matter is remanded to the trial court to determine the proper custody credit to be awarded to Stopani. The trial court is directed to prepare amended abstracts of judgment reflecting the modifications stated above, and to forward the amended abstracts of judgment to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.                    MANELLA, J.

13